[No. 5446.    Decided April 22, 1905.]

AMELIA RATHJENS, *Appellant,* v. F. S. MERRILL,
   as *Administrator etc., et al., Respondents.*[1]

WILLS—CONSTRUCTION—NAMING BENEFICIARY—INDEFINITE DE-
SCRIPTION—INTENT—EXTRINSIC EVIDENCE. Where a will named
one W as the beneficiary, describing him as the testator's half-
brother, it may be shown by extrinsic evidence that he had no
half-brother, but had a brother-in-law of that name, with whom he
had been living, and this clearly shows that the brother-in-law
was intended.

WILLS—TESTAMENTARY CAPACITY—UNDUE INFLUENCE—EVIDENCE
—SUFFICIENCY—FINDING OF CAPACITY WHEN REVERSED ON APPEAL.
The evidence offered by a wife upon contesting her husband's will,
wherein he made his brothers-in-law his sole devisees, is sufficient
to show want of testamentary capacity, and to overcome the prima
facie case from the formal admission of the will to probate, where
there was evidence to the effect that, during the few months be-
fore his death, he made a contradictory will making his wife the
sole devisee, commenced an action for a divorce, and soon re-
pented thereof, and finally committed suicide, and there was evi-
dence of his drinking to excess, bodily infirmity, wild appear-
ance, incoherent talk and peculiar conduct, by sixteen intimate
acquaintances, many of whom expressed the opinion that he was
mentally unbalanced; and where he complained that his brothers-
in-law urged him to make a will in their favor and to obtain
the divorce, and where during all of said time he wrote many
letters to his wife evincing the warmest affection; and in such
a case a finding by the trial court of testamentary capacity, upon
the close of the evidence of the contestant, will be reversed.

   SAME.    The fact of suicide raises a serious doubt as to a de-
cedent's sanity, and the fact of disinheriting a wife after recently
making her his sole beneficiary is a circumstance lending color to
the charge of undue influence.

   SAME.    In such a case the testimony of the attesting wit-
nesses, who were not acquainted with the testator, and of a
physician who had treated him for but a few days, to the effect
that they noticed nothing indicating incapacity or undue in-
fluence, is not enough to sustain a finding by the trial court of

   [1]Reported in 80 Pac. 754.

testamentary capacity, in the face of the extraordinary circumstances and large number of witnesses to the contrary; since the fact must be determined not merely from the testator's conduct upon executing the will, but from the circumstances leading up to that time.

SAME—PRIMA FACIE CASE—BURDEN OF PROVING CAPACITY. The prima facie case of testamentary capacity from the admission of a will to probate having been overcome, it is incumbent upon the contestees to produce evidence that the testator was of sound mind and not unduly influenced.

TRIAL—VERDICT—ADVISORY TO COURT—JURY—WITHDRAWING CASE FROM—APPEAL—REVIEW. In an equity case, a jury called as advisory to the court may be dispensed with at any time, and such action will not be reviewed on appeal.

Appeal from a judgment of the superior court for Spokane county, Kennan, J., entered June 30, 1904, in favor of the proponents of a will, after a hearing before the court and a jury, dismissing on the merits a contest of a will. Reversed.

*A. C. Shaw* and *John C. Kleber,* for appellant, cited: *Swarthout v. Swarthout,* 111 Wis. 102, 86 N. W. 558; *Jackman's Will,* 26 Wis. 104; *Voorhees v. Voorhees,* 39 N. Y. 463, 100 Am. Dec. 458; *Tyler v. Gardiner,* 35 N. Y. 559; *Disch v. Timm,* 101 Wis. 179, 77 N. W. 196; *Wheeler's Will,* 5 Misc. Rep. 279, 25 N. Y. Supp. 313; *Davis v. Dean,* 66 Wis. 100, 26 N. W. 737; *Will of Slinger,* 72 Wis. 22, 37 N. W. 236; *Parry v. Parry,* 80 Wis. 122, 48 N. W. 654; *Creamer v. Ingalls,* 89 Wis. 112, 61 N. W. 82; *Ashmead v. Reynolds,* 134 Ind. 139, 33 N. E. 763, 39 Am. St. 238; *Sears v. Shafer,* 6 N. Y. 268; *Bryant v. Pierce,* 95 Wis. 331, 70 N. W. 297; *Fox v. Martin,* 104 Wis. 581, 80 N. W. 921; *Terry v. Buffington,* 11 Ga. 337, 56 Am. Dec. 423; *Hess' Will,* 48 Minn. 504, 51 N. W. 614, 31 Am. St. 665; *Estate of Cahill,* 74 Cal. 52, 15 Pac. 364; *Carroll v. Hause,* 48 N. J. Eq.

269, 22 Atl. 191, 27 Am. St. 469; *Herster v. Herster,* 122 Pa. St. 239, 16 Atl. 342, 9 Am. St. 95; *Richmond's Appeal,* 59 Conn. 226, 22 Atl. 82, 21 Am. St. 85; *Small v. Small,* 4 Greenl. 220, 16 Am. Dec. 253; *Harvey v. Sullens,* 46 Mo. 147, 2 Am. Rep. 491; *State v. Thruston,* 92 Mo. 325, 4 S. W. 930, 1 Am. St. 720; 1 Redfield, Wills, 537; *Gay v. Gillilan,* 92 Mo. 250, 5 S. W. 7, 1 Am. St. 712; *Pearson v. Inlow,* 20 Mo. 322, 64 Am. Dec. 189. They contended, among other things, that undue influence may be sufficient to influence one of weak mind where it would not be sufficient to influence one of vigorous mind. *Reichenbach v. Reichenbach,* 127 Pa. St. 564, 18 Atl. 432; *Taylor v. Wilburn,* 20 Mo. 306, 64 Am. Dec. 186; *Potts v. House,* 6 Ga. 324, 50 Am. Dec. 329; *Hartman v. Strickler,* 82 Va. 225; *Leverett's Heirs v. Carlisle,* 19 Ala. 80; *Rollwagen v. Rollwagen,* 63 N. Y. 504; *Edge v. Edge,* 38 N. J. Eq. 211. Partial intoxication is sufficient to invalidate the execution. *Estate of Cunningham,* 52 Cal. 465. Unequal distribution is a potent factor in establishing undue influence. *Salisbury v. Aldrich,* 118 Ill. 199, 8 N. E. 777; *Coffin v. Coffin,* 23 N. Y. 9, 80 Am. Dec. 325. Direct and positive proof of undue influence is not essential. *Saunder's Appeal,* 54 Conn. 108, 6 Atl. 193; *Estate of Shepardson,* 53 Mich. 106, 18 N. W. 575; *Woodbury v. Woodbury,* 141 Mass. 329, 5 N. E. 275, 55 Am. Rep. 479; *Drake's Appeal,* 45 Conn. 9. That an estrangement was brought about by a conspirator is alone sufficient. *Shell's Estate,* 28 Colo. 167, 63 Pac. 413, 89 Am. St. 181; *Lynch v. Clements,* 24 N. J. Eq. 431. Suicide is strong evidence of insanity. *Jones v. Gorham,* 90 Ky. 622, 14 S. W. 599, 29 Am. St. 423, 10 L. R. A. 223; *Succession of Bey,* 46 La. Ann. 773, 15 South. 297, 24 L. R. A. 577; *Brooks v. Barrett,* 7 Pick.

94; *Waterman v. Whitney,* 11 N. Y. 157, 62 Am. Dec. 71; *Grand Lodge I. O. M. A. v. Wieting,* 168 Ill. 408, 48 N. E. 59, 61 Am. St. 123; *Burkhart v. Gladish,* 123 Ind. 337, 24 N. E. 118; Browne, Medical Jurisp. Insanity, §§ 229, 230; 2 Greenleaf, Evidence, § 690; *Frary v. Gusha,* 59 Vt. 257. The letters and declarations of the testator are controlling. *In re Bull,* 2 N. Y. Supp. 52; *Bush v. Delano,* 113 Mich. 321, 71 N. W. 628; *Bryant v. Pierce,* 95 Wis. 331, 70 N. W. 297; *Mooney v. Olsen,* 22 Kan. 69; *Beaubien v. Cicotte,* 12 Mich. 459.

*Graves & Graves* and *E. W. Hand,* for respondents, upon the subject of undue influence, cited: Schouler, Wills (3d ed.), §§ 227, 232; *Conley v. Nailor,* 118 U. S. 127, 6 Sup. Ct. 1001, 30 L. Ed. 112; *McMahon v. Ryan,* 20 Pa. St. 329; *Eckert v. Flowry,* 43 Pa. St. 46; Rood, Wills, § 180; *Dumont v. Dumont,* 46 N. J. Eq. 223, 19 Atl. 467; *Salter v. Ely,* 56 N. J. Eq. 357, 39 Atl. 365; *Hess' Will,* 31 Am. St. 665, note 680; *Beyer v. Le Fevre,* 186 U. S. 114, 22 Sup. Ct. 765; *Gorkow's Estate,* 20 Wash. 563, 56 Pac. 385; *Hunt v. Phillips,* 34 Wash. 362, 75 Pac. 970.

Root, J.—On January 5, 1904, Jacob Rathjens, a resident of Spokane county, Washington, died from the results of a gunshot wound inflicted by himself about four weeks prior thereto. Shortly after his death, a document executed September 21, 1903, purporting to be his last will and testament, was admitted to probate by the superior court of that county. Thereafter a document executed October 7, 1903, purporting to be his last will and testament, was admitted to probate, and the former action, as to the other purported will, set aside. The present case is a proceeding by the widow of decedent,

contesting the purported will last admitted to probate, and seeking to have the same declared to be null and void, for the reason that testator did not have testamentary capacity, mentally, at the time of the execution of the will, and for the further reason that he was unduly influenced by the executor named in said will, and by the principal beneficiary thereof and his brother—these latter being brothers of contestant. Upon the hearing, the trial judge summoned a jury to pass upon the questions of fact. At the close of contestant's case, contestees moved to withdraw from the jury the various questions involved, and to dismiss contestant's petition. The court granted this motion and entered an order and decree establishing the validity of the will. From said decree, contestant appeals to this court.

Several errors are assigned, the principal one being as to the holding of the court that the evidence was insufficient to show incapacity of the testator at the time of making the will. One of appellant's contentions is that the will is indefinite and uncertain as to the beneficiary intended therein. By the will, testator devised all of his real estate to Ferdinand Wiese, whom he describes in said will as "my beloved half brother." As a matter of fact, he had no half brother, but he did have a brother-in-law by the name of Ferdinand Wiese, with whom he had been living part of the time prior to his death. We think it is perfectly evident that the brother-in-law, Ferdinand Wiese, was the beneficiary intended, and that it was permissible to show by extrinsic evidence the relationship and surroundings of testator and said Wiese, in order to show the proper construction to be placed upon the language of the will with reference to the question of whom he intended as the beneficiary of this devise.

The evidence produced upon the trial established the following facts: That testator and contestant were married September 17, 1896; that testator, at that time, owned property of the value of about $500; that they immediately went to live upon a farm in Lincoln county, where they continued their residence for the period of five years; that they both worked hard, she working much of the time in the field, doing a man's work; that financial prosperity attended their efforts, and, at the end of the five years, they had accumulated property of the value of about $18,000; that they then moved to Spokane city, where he engaged in one or two kinds of business, one of them being the conduct of a saloon; that he contracted the habit of drinking heavily; that, on January 14, 1903, contestant began a divorce against him on account of drunkenness and cruelty; that, on January 28, they entered into an agreement whereby they divided all of their property, and the divorce case was dismissed and the parties again went to living together; that they continued living together until in July or August, 1903, when appellant refused to live with him longer, assigning as reasons his continuous drunkenness and brutality, when under the influence of liquor; that, on October 17, 1903, he began a divorce suit against her upon the ground of cruelty and abandonment; that subsequently he wrote to her and said that he did not want to prosecute said divorce case, but was very anxious to have her again live with him; that on November 7, 1896, he made a will wherein he made contestant his sole devisee; that on September 21, 1903, he again made a will in which he made contestant his sole devisee; that seventeen days thereafter, to wit, on October 8, 1903, he made the will involved at this time, wherein he made his brother-in-law sole devisee.

During the few months preceding his death, he wrote his wife a large number of very affectionate letters, these letters having to do with their business affairs and with their family and social matters, and urging her to again live with him. Said letters show him to have been an emotional man, and possessed of a great fondness and deep affection for his wife. In one of them he says: "I am not able to sleep the whole night long. I pass the time crying." In another, upon receiving a letter from her, he says: "My heart is now become light, for I thought I was all alone in the world. The tears are running down my face for joy, for I cannot leave you." In many of his letters similar expressions about weeping and crying all night, and his great grief, are mentioned, and he speaks about his determination to quit drinking. In one he says: "I have not drank a glass of beer, and never will again, and if the devil comes and tells me to drink it, I will not do it, for I feel like a man." Twenty-two of these letters were introduced in evidence, ranging from March 20, 1903, to December 21, 1903, the latter but fifteen days before his death. In this last letter he says: "My dear mamma, I can tell you that I am entirely lost that I cannot be with you, but it is my own fault that it is so." In the same letter he says for her to stop the divorce and he will pay everything, "for I cannot live without you. I would rather be a dead man than live without you." And in the same letter he says: "Write me what you would like for Christmas;" and he also says in the same letter: "If I sell my land I will make you a nice Christmas present, such as you have never yet had." In the letter of December 3 he says: "Therefore I wish to tell you that I do not wish a divorce, for I love you

and cannot go through with it because it is against my wishes. If you will stop it I will pay the costs."

Numerous witnesses testified that, as a rule, he spoke in the highest terms of his wife, only denouncing her at times when he was under the influence of liquor. Contestant gave testimony and placed upon the witness stand sixteen witnesses. Nearly all of them, except Mr. Chamberlain, testified to peculiar conduct on the part of testator during several months before his death—many of them expressing the opinion that he was "crazy," insane, weakminded, or mentally unbalanced; that he was in the habit of talking incoherently, and having a wild look in his eyes. One witness testified that testator told him that he had once before attempted suicide, and there was evidence that he had made threats of so doing. There was also evidence that his brothers-in-law had used their influence to foment trouble between him and contestant, and that he had stated to different parties that these brothers-in-law had been urging him to make a will in their favor.

In the course of the trial, two witnesses for the contestees were placed upon the witness stand, out of order, and their evidence taken, which was of course before the court at the time the ruling heretofore mentioned was made. One of these was a witness to the will, but he had never seen the testator before, and knew nothing about him, and merely described what transpired on the occasion of the will's being signed. Another was a doctor who attended decedent the last ten days before his death, but who had not, prior to that time, attended him or made any examination of him professionally. He testified as to finding nothing showing insanity. Another of the subscribing witnesses to the will, a Mr. Chamberlain, testified to what transpired at the time the will was executed.

29–38 WASH.

Testator came to Chamberlain's office one day, and gave directions to have the will prepared, and came the next day and signed the same. He was accompanied by Ferdinand Wiese, the beneficiary. Mr. Chamberlain had never seen the testator before, but he says that he took notice of him at that time, and thought he appeared rational and knew what he was doing, and that he seemed to be acting according to his own wishes, and that he saw no evidences of undue influence. The trial court expressed the view that the evidence, so far as it tended to show testator to be mentally unbalanced, showed his mental trouble to be of an intermittent character, and the court was of the opinion that the evidence did not sufficiently show that he was mentally incapacitated at the particular time when he executed this instrument. Attorneys for contestees argue with ability that the findings of the trial court should not be disturbed by this court unless we should be very fully convinced that the lower court was in error in this particular—urging that the opportunity of the trial court to see the witnesses, observe their appearance, conduct and manner of testifying, and having advantage of all those little occurrences that happen in a trial, which are often of much assistance in arriving at a correct conclusion, and which are incapable of being brought to an appellate court in a record, afforded that court a much better opportunity to correctly weigh the evidence than could possibly be given this court upon the record. We are impressed with the logic and force of this contention, and were it not for the conceded facts of an extraordinary character in this case, taken together with the evidence and opinions of so large a number of persons who knew the testator intimately, and from said intimate acquaintance believed him to be mentally unsound, we should certainly hesitate to disturb the findings of the trial court.

But it seems to us that, in view of all the circumstances shown in this case, the finding of the honorable superior court was not justified. We think that the circumstances were of that peculiar character that should have called for all the evidence available, before a decision was pronounced as to the testamentary capacity of the decedent. The fact that he had, on two former occasions, executed wills making his wife his sole devisee, and had engaged up to within a few days of his death in an extensive correspondence, breathing the warmest love and affection for her, made the execution of a will omitting her an unusual occurrence; and when we have the evidence of so large a number of his intimate acquaintances to the effect, that he was drinking to excess; that his appearance was frequently wild; that his talk was incoherent, disconnected, sometimes silly; that he frequently visited the premises where his wife was staying, in the middle of the night, or at two or three o'clock in the morning; that he had complained that these brothers-in-law had urged him to make a will in their favor; that they had offered to pay the expenses of a divorce case if he would bring it; that, after bringing it, he stated orally and also wrote that he did not want a divorce, and that it was against his wishes—it seems that all of these things, taken together, are abundantly able to establish a condition of testamentary incapacity which is not overcome by the evidence of the doctor and the subscribing witness to the will hereinbefore mentioned.

It is not a man's conduct or appearance, at the time, merely, of the execution of a will, that determines his testamentary capacity. These indications must be considered in connection with all of the circumstanes leading up to that time, in order that a proper estimate may be made of his mental capabilities, and of the influences, if

any, that prompted his testamentary action. The fact of suicide is, in itself, in a case like the one at bar, sufficient to raise serious doubt of a decedent's sanity. The fact of his absolutely disinheriting his wife by a will made only seventeen days after the execution of one wherein he made her the sole beneficiary, is another circumstance which, in the absence of any proper cause shown for the sudden change, lends color to the charge of undue influence, or shows him to have been inwardly actuated in a strange and unusual manner. His extensive correspondence, profuse with expressions of warmest love and affection, covering the period during which he made the two contradictory wills, started a divorce case, repented thereof, and shot himself, evidences a vacillation of mind most pronounced and peculiar. In the light of these established, undisputed facts, the evidence of his bodily infirmity, weak and vacillating mind, queer actions, wild appearance, strange, incoherent, contradictory talk, wavering, uncertain mental condition, as given by the contestant and her sixteen witnesses, seems to us to establish a case in her behalf that was not overcome by the evidence favorable to contestees.

We think the trial court should have required the contestees to produce evidence on their part as to the mental condition of the decedent, and as to the relationship, intercourse, and conduct of the brothers-in-law with and concerning said testator. When a person has made a will it ought not to be set aside without good and sufficient reasons; but the law expressly provides certain indispensable prerequisites to the making of a valid will. It is incumbent upon those relying upon a purported will to show, among other things, that the testator was of sound and disposing mind, and not acting under fraud, undue influence, or misrepresentation. The formal admission

of the will, upon the evidence of the subscribing witnesses, established a *prima facie* case in favor of its validity. But it was merely a *prima facie* case. The statute provides that, after the will is thus formally admitted to probate, it may be contested. This contest is brought under that provision of the statue. It is the purpose of the law that the issues as to the testamentary capacity of the deceased shall be determined on the evidence therein introduced, starting with the recognition of the document's validity *prima facie* merely.

The action of the trial judge in withdrawing the case from the jury was a matter which, of course, this court will not review. The jury in a case of this kind is merely advisory to the court. Its verdict upon any question of fact submitted would not be binding upon the court. Consequently, it was in the court's discretion to dispense with the jury at any time it thought proper. Upon the evidence as a whole we think the action of the trial court in dismissing the proceeding erroneous.

The order, judgment, and decree of the honorable superior court is reversed, and the case remanded for a new trial. The appellant will be allowed costs of the former trial in the superior court, together with taxable costs in this court, the same to be allowed from the property of the estate.

MOUNT, C. J., DUNBAR, CROW, and RUDKIN, JJ., concur.

HADLEY and FULLERTON, JJ., took no part.