[No. 23125. Department Two. September 3, 1931.]

*In the Matter of the Estate of* JOSEPHINE L. McCOMBS, *Deceased.*

ROLAND D. McCOMBS, *individually and as guardian ad litem for James Roland McCombs, a minor, et al., Appellants, v.* E. B. PALMER, *individually and as executor of the estate of Josephine L. McCombs, deceased, et al., Respondents.*[1]

[1] Reported in 2 P. (2d) 692.

*Florence Mayne Hickey* and *Schwellenbach & Merrick,* for appellants.

*Thos. M. Askren* and *S. W. Brethorst,* for respondents.

BEALS, J.—This is an attack upon the will of the late Josephine L. McCombs, waged by her son, Roland D. McCombs, individually and as guardian *ad litem* for his minor son, James Roland McCombs, by Pearl Mc-Combs Clark, daughter of the testatrix, individually and as guardian *ad litem* for her minor daughter, Elizabeth Clark, and by Denny Clark, son of Pearl McCombs Clark. The respondents in this proceeding are E. B. Palmer, individually and as executor of the last will and testament of Josephine L. McCombs, deceased, and (John) Marshall Maggs.

A brief statement concerning the family of the testatrix and of several transactions between them is necessary to a proper understanding of the issues. Samuel Denny, a pioneer of King county, January 1, 1873, conveyed to his daughter, Josephine L. Mc-Combs, and her husband, James McCombs, a tract of land approximately one hundred fifty-four acres in extent, lying a few miles north of the present limits of the city of Seattle. During the year 1892, Mr. and

Mrs. McCombs took up their residence on this property, where they lived during the remainder of their lives.

Mr. and Mrs. McCombs had four children: Frank, born in 1873; Roland D., born in 1876; Pearl, born in 1879 (married Everett C. Clark); and Thomas H., born in 1881. Frank left home early and disappeared, —with him we are nowise concerned; Roland left home during or prior to his seventeenth year, later marrying and establishing his own home; Pearl married during her twenty-first year, and after her marriage did not reside with her parents; Thomas H., or Tom, as he was called, never married, but lived with his parents until his father's death, and after that resided on the home place with his mother until his death, which occurred August 13, 1929. As the population of King county increased, the McCombs' land became more and more valuable, although it, of course, was not the source of any great amount of income, and portions thereof were from time to time disposed of.

December 4, 1900, Mr. and Mrs. McCombs deeded to their son Tom ten acres of land for an expressed consideration of three hundred dollars. Approximately ten years later, Mr. and Mrs. McCombs deeded to their son Roland five acres, and January 23, 1926, Tom received a deed of twenty-six acres, leaving sixteen and one-quarter acres still standing in the parents' names.

James McCombs died September 9, 1926, at a great age and after a lingering illness. By his will, dated October 30, 1925, James McCombs left to his son Frank, whom he believed to be dead, one dollar, and to each of his other children five dollars, devising all the remainder of his estate to his wife. Mrs. McCombs had, on the same day her husband made his will, executed her will, making identical bequests to her children and naming her husband as her residuary lega-

tee. These wills were practically identical with former wills, in which the testators had disposed of their respective estates in the same manner.

Tom McCombs died August 13, 1929, leaving a will in which he devised all of his property to his mother, if she survived him, and thereafter, August 21, 1929, Josephine L. McCombs made a will (being the will attacked in this proceeding), by which she bequeathed to her daughter Pearl the sum of five thousand dollars; to her son Roland the sum of one thousand dollars; to her son Frank the sum of one dollar; to Carl Olson, a neighbor and friend, to whom the family was obliged for many courtesies, five thousand dollars; to Mary Bolin, who had been attending her as nurse, twenty-five hundred dollars; to her grandchildren, J. Denny Clark and Elizabeth Clark (children of her daughter Pearl) and James Roland McCombs (child of her son Roland), fifteen hundred dollars each; five friends or relatives were each bequeathed one hundred dollars; the testatrix devising all the residue of her estate to John Marshall Maggs and E. B. Palmer, share and share alike, Mr. Palmer being named as executor without bond, and the will providing for the settlement of the estate without the intervention of the court.

February 14, 1930, Josephine L. McCombs, being then very ill and suffering from cancer, executed a codicil to her will, which codicil is also under attack herein, by the terms of which the bequests to her daughter Pearl and her son Roland were revoked, for the expressed reason that the testatrix had that day delivered deeds to her children, one conveying to Mrs. Clark a tract of land about six and one-quarter acres in extent, the other conveying to Mr. McCombs a tract of ten acres. By the codicil, the bequest to Mrs. Bolin was reduced from twenty-five hundred dollars to one

thousand dollars, the bequests to the three grand-children were revoked, a small bequest to Mrs. Isora Baker was added, and Messrs. Maggs and Palmer were requested to release from the lien of a mortgage which they held upon the entire tract, the land deeded to the children of the testatrix. Mrs. McCombs, having reached the age of upwards of eighty years, died a few days after the execution of the codicil, her will above referred to and the codicil thereto having been admitted to probate February 26, 1930.

During the month of May following, this proceeding was instituted by way of a contest of the will and of the codicil, contestants alleging that the will and codicil had been procured by fraud and undue influence,. and that the same were for that reason void. After a lengthy hearing, the trial court entered a decree upholding the will and the codicil thereto and dismissing the contest, from which decree contestants appeal.

Appellants assign seven errors which they contend entitle them to a reversal of the decree: (1) That the trial court erred in ruling that the burden rested at all times upon appellants to prove that the will was procured through fraud or undue influence; (2) that the trial court erred in denying appellants' application for a jury trial; (3 and 4) that the trial court erred in excluding testimony as to the mental capacity of James McCombs during the last two years of his lifetime, and also erred in refusing to allow appellant Pearl Clark to testify as to her father's intent concerning the disposition of his property; (5) that the trial court committed error in interrupting respondent E. B. Palmer while the latter was testifying as a witness on his own behalf; (6) that the decree is not sustained by the evidence, but, on the contrary, is against the evidence, which appellants contend requires the

entry of a decree in their favor; and (7) that the trial court erred in denying appellants' motion for a new trial.

Appellants admit, although complaining of the doctrine, that the law favors wills. *In re Roy's Estate,* 113 Wash. 277, 193 Pac. 682. Appellants also criticize the attitude of courts towards will contests in which testaments are attacked upon the ground of alleged undue influence. While admitting that, generally speaking, the burden to establish the illegality of a will rests upon the contestant, appellants contend that, under certain exceptional circumstances, a contestant is to some extent relieved of this burden, and that, in such cases, when the contestant has made a *prima facie* case, the burden of proof shifts to the proponent of the will, who is then obliged to prove, by a preponderance of the evidence, that the will is genuine and untainted by fraud or undue influence. Appellants argue that their proof brought them squarely within such a recognized exception to the general rule, and that the trial court erred, in view of the evidence, in holding that the burden at all times rested upon appellants to prove the illegality of the will and codicil here in question.

It may appropriately be said at the outset that we do not agree with appellants in this contention. Under the testimony, we hold that at no time did the burden of proof shift to respondents, but the same at all times rested upon appellants, who were required to prove, by at least a preponderance of the evidence, that Mrs. McCombs' will and the codicil thereto were procured by undue influence, or by fraud exerted or employed by respondents, to appellants' prejudice. Rem. Comp. Stat., § 1387; *Higgins v. Nethery,* 30 Wash. 239, 70 Pac. 489; *Hunt v. Phillips,* 34 Wash. 362, 75 Pac. 970;

*In re Adin's Estate,* 112 Wash. 379, 192 Pac. 887; *In re McKachney's Estate,* 143 Wash. 28, 254 Pac. 455.

It clearly appears from the record that be-, tween respondent Marshall Maggs, on the one part, and Tom McCombs and his mother, on the other, there existed a warm friendship of many years standing. Mrs. McCombs for years kept a diary, and the same is replete with references to Mr. Maggs, and with recorded appreciation of courtesies extended by him to Mrs. McCombs and her son. These diaries are most important, and we have studied them carefully. In this connection, appellants call attention to two notations in the diary in which Mrs. McCombs recorded the fact that Mr. Maggs had made lengthy visits, which had delayed Tom in his milking and other duties in connection with the farm; but we cannot consider that these two references, in view of all the diaries, and other admitted facts, have any weight whatsoever, and we are of the opinion that a most sincere friendship of long standing existed between Mrs. McCombs and Marshall Maggs. It is also established beyond dispute that a warm friendship existed between Tom Mc-Combs, Marshall Maggs (as to these two dating from boyhood) and respondent E. B. Palmer, who is a member of the bar of this court of many years standing. The three much enjoyed fishing and hunting, and often went on short trips engaged on one or other of these occupations. Mr. Palmer frequently visited the McCombs home, and on many occasions made Mrs. McCombs presents of flowers or candy, which evidently greatly pleased her, as noted in her diaries.

Appellants contend that respondents, for five years prior to Mrs. McCombs' death, endeavored to insinuate themselves into her good graces, with the object of ultimate financial profit to themselves, and that such nefarious purpose was successfully accomplished in the

unlawful and fraudulent procurement of the will and codicil under attack in this proceeding.

The relations existing between the different members of the McCombs family should now be considered. It is not contended that Mrs. McCombs, although she suffered for years from an incurable malady, and was over eighty years of age at the time of her death, was ever lacking in testamentary capacity. Appellants' witnesses vie with those testifying on behalf of respondents in stating that Mrs. McCombs was very intelligent, that she was mentally keen and alert, and that her intellect was of a high order. There can be no question but what she was a lady of high character and strong will, positive and discriminating in her likes and dislikes, firm in her affections, and not easily influenced, unless, possibly, by her son Tom, her youngest child, to whom she was attached by the strongest bonds of maternal love. Tom McCombs remained with his parents; he had no other ties, and appears to have been at all times a devoted son. Appellants, of course, attack Tom McCombs, and contend that he unjustly influenced his mother against appellants. Concerning Tom McCombs, the trial court, in its memorandum opinion, had this to say:

"Thomas McCombs is not a party to this proceeding, neither he nor his estate are called upon to defend against this action; but in justice to one whose lips are now sealed in death, let it be said in passing, and to his credit, that in the opinion of the court, under the evidence in this case, Thomas McCombs gave to the exhaustion of his physical strength all that he could toward the care of his parents and the upkeep of their property. Furthermore, that for filial devotion and respect his monument could not be large enough to accommodate the many testimonials thereto appearing in his own mother's diary. The escutcheon of the Denny family is not marred, but adorned, by his having lived. Any conclusion that he exercised an

undue influence over his mother can only be drawn, I think, from distorted inferences concerning the intimacies of the closest family relationships. To place such a construction upon his conduct is to indict the concern and care which a loyal son entertains for an aged and physically dependent mother.''

It is undisputed that ill feeling existed between Tom McCombs, on the one part, and his brother and sister, who are appellants here, on the other. As far back as 1910, Tom had manifested dislike of Pearl's husband. These appellants resented the fact that their parents, shortly prior to the death of their father, conveyed to Tom twenty-six acres of that portion of the original tract which then remained in their ownership, leaving only sixteen and one-quarter acres in the names of James and Josephine L. McCombs. Appellants also felt that they should have been consulted concerning matters affecting the family. Appellant Pearl Clark testified that, the day after their father's death, she and Tom, while arranging for the funeral, talked about the property, and that Tom told her of the deed to himself, and that she then said, ''You know those couldn't stand, because papa was not mentally able to make out papers of that kind.'' Appellant Roland McCombs testified that his sister told him of this conversation immediately after the funeral, and repeated to him Tom's answer (to which Pearl Clark also testified), ''What are you going to do about it?'' On cross-examination, Mrs. Clark stated:

''I never said that I accused Tom during his lifetime of perpetrating any fraud on my mother or on me. I never said anything to him about it, but during the conversation he certainly knew that was what I meant. I didn't come out and charge him with it, but he certainly knew that must have been what he had done.''

There can be no question but that, from this time on, enmity existed between the brother and sister who are appellants here and their brother, Tom McCombs. In view of this situation, we are satisfied that it is extremely unlikely that Tom McCombs, of his own volition, would have thereafter made a will leaving any of his property to his brother, his sister, or the children of either of them. This is important in connection with matters hereinafter discussed.

There can be no question but what Tom's feeling towards his brother and sister was reflected in the attitude of the mother towards her daughter and her son Roland. The children seldom came to the home, and while, from the mother's diary, it is evident that she loved them, it is also evident that she resented their attitude towards Tom, and, to some extent, their treatment of herself. However much appellants may seek to minimize the feeling of resentment which existed in the heart of their mother, and however one may speculate as to how easy it might have been to have done away with this feeling and reestablished the family on the basis of mutual love and confidence, it is undoubtedly true that the relationship between appellants and their mother was not cordial, and that some sort of a mental barrier had grown up between them. This appears from the testimony of Pearl Clark, who stated that, in a conversation over the telephone, she said to her mother:

" 'Only just one thing I would like to have you explain, and that is why one child was given your full confidence and the other two children were left out and ignored.' And she grew quite excited. And I said, 'Well, Mama, let us not talk any more, let us hang up,' and we did."

The testimony is long, much of it being devoted to this phase of the case, and a detailed analysis thereof would unreasonably extend the length of this opinion.

It is now necessary to discuss the different wills made by Mrs. McCombs and her son Tom. November 13, 1926, shortly after the death of her husband, Mrs. McCombs made a will whereby she devised to her son Roland five acres of land, and to her daughter Pearl a similar tract, to her son Frank (who is always mentioned because of the possibility that he might still be living, but who will not again be referred to in this opinion) the sum of one dollar, and to her son Tom the remainder of her property, with the request that he pay to several of Mrs. McCombs' nieces the sum of one hundred dollars each. April 22, 1927, Tom McCombs made his will, leaving his entire estate to his mother, and appointing respondent E. B. Palmer executor. April 27, 1928, Mrs. McCombs made another will bequeathing to Roland and Pearl five dollars each, for the reason, as stated in the will, that

" . . . neither one came near or helped me in any way since their father's death in 1926, although I have been sick and alone the greater part of the time. They have done nothing to help in any way."

Under this will, Mrs. McCombs bequeathed her entire estate to her son Tom, naming respondent E. B. Palmer as executor.

Early in the year 1929, Tom McCombs' health began to fail, and it evidently occurred to him that he might not long survive. March 19th, he called at the office of respondent E. B. Palmer, giving instructions for the preparation of a codicil to his will, which was prepared and formally executed by Tom the next day. By this codicil, Tom, in the event of his surviving his mother, devised to his friend, James Hewitson, a tract

of land; to his friend, Carl Olson, a life annuity of fifty dollars a month, because of Mr. Olson's kindness to Tom's mother; to Mrs. Mary Bolin, one thousand dollars, because of services rendered by her to Tom's mother and to himself; to appellant Pearl Clark the sum of five thousand dollars in cash, or, in the alternative, five acres of land, as the executor should determine; and to his brother Roland, the sum of five dollars. The remainder of his estate Mr. McCombs devised to his friends, Marshall Maggs and E. B. Palmer, who were named joint executors. At the same time, Mr. Palmer prepared, under instructions from Tom McCombs, a codicil to his mother's will, which she executed March 20, 1929. By this codicil, Mrs. McCombs provided for the possibility of the death of her son Thomas prior to her decease, and in that event disposed of her estate in the same manner as Tom disposed of his by the codicil to his will above referred to.

By these codicils, Mrs. McCombs and her son each provided for the contingency of the death of the principal beneficiary prior to the death of the testator. These codicils, executed practically simultaneously by mother and son, are extremely important, as manifestly showing the result of some understanding between them, and as embodying their joint wishes. Careful study of these codicils, and of the circumstances under which they were executed, renders all of Mrs. McCombs' later acts readily understandable.

Tom McCombs died August 13, 1929, his mother taking as sole beneficiary under his will, the codicil thereto being therefore ineffective. August 21, 1929, Mrs. McCombs executed the will which, with the codicil of February 14, 1930, the terms of both of which are hereinabove set forth, is now under contest.

It will be noticed that a certain thread of consistency runs through several of these wills. In the first place, Roland McCombs had received from his parents a gift of ten acres of land, while his sister, Pearl, had received nothing. Consequently, Mrs. McCombs in all her wills, save that of April 27, 1928, provided that Pearl receive a greater amount than she bequeathed to her son Roland, and Tom McCombs, in the codicil to his will executed March 20, 1929, bequeathed to his sister five thousand dollars in cash, or an equivalent in land, which, considered with the codicil to her will simultaneously executed by his mother, clearly indicates, as above stated, an agreement between mother and son as to the disposition of the property upon the death of the survivor. In this, we think that the influence of the mother appears in the bequest to Pearl, as it is unlikely that Tom, because of his ill will towards his sister, would of his own choice have made her, even to a small extent, a beneficiary under his will. Of course, the influence of Tom is discernible in the naming, by his mother, of Messrs. Maggs and Palmer as residuary legatees.

At this point may be noted the steps taken by Mrs. McCombs in connection with the revocation of her will of November 13, 1926, and the execution of her will of April 27, 1928. The testatrix crossed out with a pen the third and fourth paragraphs of the will, containing bequests to Pearl and Roland, which she desired to revoke, and tore off a portion of the second page. She then wrote the following in longhand, from which in part was prepared Mrs. McCombs' will of April 27, 1928:

"I, Josephine L. McCombs, of the city of Seattle, county of King, state of Washington, being of majority, to-wit, of the age of 78 years, and of sound and disposing mind and memory, and acting under no re-

straint, influence or representation of any person or persons whatsoever, do freely and voluntarily make, publish and declare this my Last Will and Testament:

"First: I direct that my body be decently disposed of by the side of my husband, James McCombs, whom I lived with in peace for fifty-five years, without undue ceremony and with proper regard to my position in life.

"Second: I direct that my representative as named shall pay my funeral expenses and the expenses of my last illness and funeral expenses and my debts, if there are any.

"Third: I give and bequeath to Roland Denny McCombs and my daughter, Pearl McCombs Clark, the sum of five dollars each, as they have neither one come near nor helped me in any way since their father's death in September, 1926, altho I have been sick and alone the greater part of the time. They have done nothing to help me in any way.

"Fifth: The same as in my former will.

"Sixth: I give, devise, bequeath to my son, Thomas H. McCombs all the rest of my estate, home, land, furniture and money, as he has always staid with us and cared for his old father and I, and I request him to care for me as long as I live.

"Perhaps you can understand what I want; if I had time I could tell you better."

We shall now take up the story from the death of Tom McCombs. It will be remembered that, at this time, there stood in Mrs. McCombs' name, of the original property, sixteen and one-fourth acres, upon which was located the family dwelling. Mrs. McCombs, as beneficiary under the will of her son Tom, which was then in course of probate, was, in addition, the owner of so much of the land as she and her late husband had at different times conveyed to Tom, making altogether approximately fifty acres. When Roland McCombs, who was working in a logging camp, learned of the death of his brother Tom, he came to Seattle and, with his nephew, Denny Clark (Pearl Clark being

then absent from the state), called at the office of E. B. Palmer, where he was advised that Tom's mother was the sole beneficiary under his will. Roland did not attend the funeral or even visit his mother, but promptly returned to his place of employment. Concerning this he testified, "I didn't go to the funeral because I was not wanted out there while he was alive, and I couldn't see why I should go afterwards."

A month or so later, Mrs. McCombs' house was destroyed by fire, and, upon learning from his sister of this loss, Roland came to Seattle and visited his mother, and, the relations between them being pleasant, continued his visits until sometime after Thanksgiving, when he left his employment and went to live with his mother, where he remained until her death. Pleasant relations were also reestablished between Mrs. McCombs and her daughter Pearl, and between Mrs. McCombs and her grandchildren.

Upon the occasion of the call at Mr. Palmer's office by Roland McCombs and Denny Clark, after the death of Tom McCombs, it appears that Denny Clark made some disparaging remarks concerning his late uncle Tom. Mr. Palmer informed Mrs. McCombs of the fact that Denny had spoken slightingly of his uncle, whereupon Mrs. McCombs wrote her grandson a long letter, explaining the history of the ranch and how much Tom had done for his parents and how hard he had worked to preserve the property, the letter concluding:

"What ails your mother and Rollie I do not know. I have a good nurse, she takes ever care of me, and lots of good friends. My heart is broke at losing Tom, but I will go soon I hope. Be a good strait man, but don't ever say anything against your Uncle Tom nor your grandmother again. Your loving Grandmother."

At the time of Tom McCombs' death, a considerable sum was due by way of taxes on the property. Mrs. McCombs executed to Messrs. Palmer and Maggs her promissory note for three thousand dollars, due on demand, secured by a mortgage upon all the land which she owned; the mortgagees agreeing to pay the taxes against the property, the mortgage to be in fact security only for such cash as they should actually disburse. Pursuant to this agreement, Messrs. Maggs and Palmer did pay certain taxes against the property. Appellants complain that they did not pay them as soon as they should have, but it does not appear that any loss was suffered on this account. This is the mortgage to which Mrs. McCombs referred in the codicil of February 14th, in connection with the deeds to her son and daughter; the mortgagees having, pursuant to Mrs. McCombs' request, released from the lien of the mortgage the tracts conveyed to Roland McCombs and Pearl Clark.

Upon the burning of Mrs. McCombs' home, respondents arranged for the construction, at a convenient place on Mrs. McCombs' land, of a small cottage, into which Mrs. McCombs moved, and in which she lived until her death. At this time, Mrs. Clark was still in the east, but she returned as soon as she could, and, upon her return, learned from her son of the letter which he had received from his grandmother. It was decided that Mrs. Clark should not visit her mother until she was sent for, but when, on a day late in October, the good neighbor, Carl Olson, paid one of his frequent visits to the McCombs home and found, as he testified, Mrs. McCombs lonely and in tears, he at once informed Mrs. Clark, who, with her daughter Elizabeth, immediately went to see her mother. From that time on, as Mrs. Clark testified, the family association was resumed as though nothing had ever been amiss.

This testimony is supported by Mrs. McCombs' diary, which contains frequent affectionate references to her children and grandchildren.

During this period, Mrs. Clark testified that she asked her mother if she could give Denny Clark a little piece of the farm, and that her mother answered, "Yes, how much would he like and where would he like it?" telling Mrs. Clark to get Mr. Palmer and have the matter arranged. Mrs. Clark stated that she did nothing more about the matter, because her mother was very ill.

Roland McCombs testified that, during the month of February, he told his mother that she ought to give her daughter Pearl a piece of property "so that she wouldn't have to go out and take in sewing," and that his mother said that she would do so. Pursuant to this conversation, Mr. Olson procured the attendance of one Lowman, a real estate man, to whom Mrs. McCombs stated that she wanted to deed her daughter a piece of property. Roland testified (no other person testifying as to this matter) that Mr. Lowman then asked Mrs. McCombs if the property was in probate, to which Mrs. McCombs answered in the affirmative, Mr. Lowman then stating that she could not at that time make a deed, and none was prepared.

The matter of the deeds to Mrs. McCombs' son and daughter will now be considered. February 13, 1930, Mrs. McCombs was feeling a little brighter than usual. She was, however, very ill and within a week of her death. She was unable to lie down, and spent all of her time in a chair. The cancer located in her breast had drawn her into a stooping posture, and had affected her neck and arms, it being difficult for her to use her hands.

Mrs. McCombs told respondent Palmer, who was in attendance at her request, that she wished to convey

some property to her children. Deeds were accordingly prepared and signed by her the next day, conveying to her son Roland ten acres and to her daughter Pearl six and one-fourth acres, the tracts together comprising all of the land which then stood in Mrs. McCombs' name outside of that which she took as devisee under the will of her son Tom. From the testimony, it appears probable that the tract conveyed to Roland was worth between eight and ten thousand dollars, and that conveyed to Pearl, approximately twelve thousand. In any event, these tracts greatly exceed in value the amount of the bequests to her children in Mrs. McCombs' will.

At this point, it may be noted that, in their petition contesting Mrs. McCombs' will and the codicil thereto, appellants alleged that Tom McCombs disliked his brother and sister, and for years did everything possible to influence his parents against them and in his favor, and that the estrangement between Mrs. McCombs and her son and daughter was due to the false representations of her son Tom. From this and from appellants' evidence, it is manifest that the undue influence of which they complain is largely that of their deceased brother.

Appellants also alleged that, under the codicil executed by Tom McCombs, and under the will of Josephine McCombs executed August 21, 1929, respondents would each have received approximately ten thousand dollars. Appellants contend that the testimony introduced on the trial indicates that, under the will of August 21st, respondents would each have received not less than twelve thousand five hundred dollars. It is not easy to estimate just what respondents will receive under Mrs. McCombs' will and the codicil thereto, nor is it particularly important to this inquiry, but we may say, in passing, that it seems unlikely that

respondents will divide more than twenty thousand dollars, and it is entirely possible that this estimate may be too high.

Coincident with instructions for the preparation of these deeds, Mrs. McCombs directed Mr. Palmer to prepare a codicil to her will, which resulted in the execution of the codicil which was signed February 14th and admitted to probate. Appellants bitterly attack this codicil, and contend that it does not express Mrs. McCombs' wishes, but that it was procured by undue influence and fraud.

In the first place, it is clear that appellants are, on the whole, better off under the two deeds to Roland and Pearl than they would have been under the will of August 21, 1929. We are also satisfied that Mrs. McCombs, in view of the execution of the deeds to her children, desired to make some change in her will. Carl Olson, testifying as a witness on behalf of appellants, stated that, the evening before the visit of respondents to Mrs. McCombs (which took place February 13th), Mrs. McCombs had stated to him that she wished to see respondents, of which the witness notified respondent Marshall Maggs, with the result that respondents visited Mrs. McCombs the next day. The witness then testified that Mrs. McCombs told Mr. Palmer that she had sixteen acres which had never been transferred, and that she would like to turn this over to Pearl and Roland, and that Mr. Palmer then asked Mrs. McCombs concerning the bequest to Mrs. Mary Bolin, suggesting that the bequest was a little large, to which Mrs. McCombs replied, ''Yes, I believe so, she was not—she seems to have deserted me, she was to have two weeks vacation, and now it is three months, and she has not showed up,'' the witness testifying that, at that time, nothing further was said

about Mrs. McCombs' will, in which latter testimony the witness was manifestly mistaken.

The witness testified that respondents came to his house before going to Mrs. McCombs' home, and that Mr. Palmer himself requested the witness to come along with them; that, after the talk with Mrs. McCombs, the witness had a conversation with Roland and Pearl, in which he advised them to accept the deeds from their mother; that he, Olson, had stated to respondent Palmer that there were many rumors concerning the McCombs property, and that it was even said that Mr. Palmer owned the place, to which respondent replied, "No, I don't; Tom wanted me to own it, and I told Tom to give it to his mother;" that Mr. Olson then said, "Why, when all the bills and debts are paid up I suppose the balance goes to the children," to which statement the witness testified that Mr. Palmer made no reply, and, continuing, "I thought he gave me a nick with his head, but that is all I know, but I couldn't swear to it. Q. You thought he nodded his head? A. Yes."

Mrs. Isora Baker, a niece of Mrs. McCombs, who was assisting in caring for her, was present during part of the conversation between respondents and Mrs. McCombs, and testified that Mr. Palmer suggested that the bequest to Mrs. Bolin was too large, to which Mrs. McCombs assented, a bequest in the amount of one thousand dollars being then agreed to. There was also some discussion as to what Mrs. Baker herself should have; she stating that she did not want anything, as she was helping because of her affection for her aunt. Mrs. Baker testified that she left the room at Mr. Palmer's request before the end of the conference. Mr. Olson apparently did not remember the discussion as to the bequest to Mrs. Baker, although he testified that he was present during the entire con-

versation, except for the time required for him to step outside to summon Mrs. Baker. Respondents testified that at this conference the entire will of August 21st was read to Mrs. McCombs, paragraph by paragraph.

Appellants strongly rely upon the testimony of Mr. Olson, who, they argue, in testifying on their behalf, was to some extent testifying against his own interest, appellants contending, while admitting that the witness testified somewhat incoherently in rather broken English, that his version of what happened at the conference between Mrs. McCombs and respondents on the morning of February 13th should be accepted. On cross-examination, Mr. Olson admitted that he was mistaken in testifying, on direct examination, that his conversation with Roland and Pearl was on February 13th, and that this conversation in fact occurred the next day. Appellants' counsel stated that he was surprised at one portion of Mr. Olson's testimony, and, taking into consideration the fact that it is admitted that Mr. Olson forgot at least portions of the conversation between Mrs. McCombs and respondents, we cannot agree with appellants in according to the testimony of Mr. Olson the weight for which appellants contend. Careful consideration of Mr. Olson's testimony to the effect that he thought Mr. Palmer "nicked" or nodded his head in response to Mr. Olson's suggestion that the children were to receive the balance of the estate, convinces us that the same is of only the slightest evidentiary value.

Appellant Pearl Clark was not present at her mother's home at the time of respondents' morning call. She arrived later in the day, and thereafter respondent Maggs returned, asking Mrs. Clark and Mrs. Baker to step outside as he wished to talk privately with Mrs. McCombs. Mrs. Clark and Mrs. Baker stepped outside, but waited on the porch where they

could hear Mr. Maggs talking in a rather loud tone; Mrs. Clark testifying that, after his departure, she said, "Mother, what is going on here that your own child, your daughter, must be put outdoors," to which Mrs. McCombs replied that she was trying to get her business straightened up, and that things were in "an awful mess," asking Pearl if she couldn't take care of matters and straighten them up for her, to which Pearl replied that she could. Mrs. McCombs then instructed her daughter to call Roland and send him after Mr. Maggs. Mr. Maggs returned, whereupon a conversation took place between Mrs. McCombs and Mr. Maggs in which the former, according to Mrs. Clark and Mrs. Baker, stated, "I want my children to have everything," to which Mr. Maggs replied that he would have to call Mr. Palmer.

Later in the day, Mr. Maggs returned and talked to Roland and Pearl, and the next morning Mr. Palmer came out with the deeds to the children and the codicil to the will. Mr. Palmer read the deeds and the codicil to Mrs. McCombs, to which appellants contend that she showed slight attention, she being then very ill and suffering from sinking spells. Mrs. Clark testified that she heard the papers read (other witnesses for appellants also testifying to this), and appellants admit that she must have realized that the codicil failed to provide for her and her brother, but contend that, because she believed from her conversation with Mr. Olson that she and her brother were to receive the residue of the estate, and on account of her mother's condition, she raised no objection. Appellants admit that Mrs. McCombs signed the deeds and the codicil, and that she then presented the deeds to Pearl and Roland, respectively, for which they thanked her; whereupon respondent Palmer departed, taking

with him the codicil, of which no copy was left with the testatrix.

Appellants vigorously attack the codicil, arguing that it speaks for itself as a fraudulent document. The first three paragraphs thereof are plain and could not be misunderstood; the first expressly revokes the legacy to appellant Pearl Clark, stating as the reason for the revocation the execution and delivery of the deed to Mrs. Clark; the second expressly revokes the legacy to Roland McCombs, because of the execution and delivery to him of the deed to his tract; the third refers to the previous legacy to Mary Bolin, and reduces the same to one thousand dollars. Appellants' principal criticism is of the fourth paragraph of the codicil, which reads as follows:

"I hereby revoke the provisions of paragraph Ninth of said will, and in lieu thereof I make the following paragraph Ninth:

" 'I hereby give, devise and bequeath to Isora Baker, my cow, certain drain tile located on my home place and my household furniture; said bequest to be as full compensation to her for her services looking after me during my last illness.' "

The ninth paragraph of Mrs. McCombs' will, revoked by the fourth paragraph of the codicil, was that containing the bequests of fifteen hundred dollars each to Mrs. McCombs' grandchildren. Appellants argue that respondents caused so much of the fourth paragraph of the codicil as revokes paragraph nine of the will to be inserted therein without Mrs. McCombs' knowledge, and that, as the provision of revocation did not call Mrs. McCombs' attention to the specific terms of the paragraph revoked, she did not realize the effect of this portion of the codicil. The Isora Baker mentioned in the paragraph of the codicil above quoted was one of the witnesses to the codicil, and

when the same was presented for probate she testified in support thereof, thereby depriving herself of the benefit of the bequest made to her.

In reviewing the decree entered by the trial court, the entire evidence must be considered. Appellants admit the great partiality of Mrs. McCombs for her son Tom. As one of their witnesses stated, "She just lived for Tom." They vigorously contend that her great affection for him was not justified, but that, as to him, she was blinded by her love, and incapable of realizing his shortcomings or the actual situation or of telling the truth concerning him, even in her diaries. Appellants contend that Tom was lazy, and that he never did work as he should have done; that he tyrannized over his mother, and was not thoughtful of her. They admit that their attack upon this deceased member of the family was a matter of embarrassment, and one likely to result in prejudice to themselves. It is their position, however, that, without attacking Tom's memory, they could not show, as they say, how "respondents entered into the life of this family and brought about chaos." It is clear that a great friendship of years standing existed between Tom McCombs and respondent Marshall Maggs. Later, respondent E. B. Palmer was taken into this group, and we find no reason for doubting that Tom McCombs regarded respondents as his best friends; indeed, it seems clear that, outside of his mother, they were closer to him than anyone else. This being true, and taking into consideration Tom's ill will toward appellants, the codicil to his will which Tom executed in March, 1929, appears quite natural.

By her will of April 27, 1928, Josephine McCombs in vigorous language disinherited appellants. Her will to do this cannot be doubted. It may be that she was influenced by Tom, but her mind was clear, she was in

full possession of her faculties, and she manifested her desires in unmistakable terms. This will did not name respondents as beneficiaries. By her codicil to this will, executed March 20, 1929, Mrs. McCombs, in providing for the disposition of her estate in case of the death of her son Thomas prior to her decease, first brought respondents within the purview of her bounty. It is, of course, evident that the execution of this codicil by Mrs. McCombs was due to some conversation between her and Tom, but we are unable to find in the record evidence which would justify a finding that the execution of this codicil by the testatrix was the result of influence by respondents, or of undue influence by Tom. It is true that the codicil was prepared in the office of respondent E. B. Palmer, but under the case of *In re Adin's Estate,* 112 Wash. 379, 192 Pac. 887, this fact is not of itself enough to require a holding that the testament was procured by undue influence, or even to throw the burden of proof on respondents.

One fact in connection with this codicil should be noticed. By it, the testatrix bequeathed to James Hewitson a small tract of land. In her will of August 21st, this bequest to Mr. Hewitson was inadvertently omitted, and Mrs. McCombs almost immediately conveyed to Mr. Hewitson the tract of land which he was to have received under her will. Mr. Hewitson was a friend of Tom's, and, in remembering him in her will and in deeding to him the tract of land, we are satisfied that Mrs. McCombs was simply carrying out Tom's wishes.

After Tom's death, Mrs. McCombs brought back her son and daughter into her will, and also remembered her grandchildren, but she still persisted in her wish to make respondents, Tom's friends, her residuary and, indeed, her principal beneficiaries. It is pleasant to know that, in her last days, Mrs. Mc-

Combs and her children became reconciled, but, in spite of this reconciliation, granting that it was as complete as is claimed by appellants, it seems probable that her love for Tom was still the dominating influence, and that Mrs. McCombs desired, in disposing of her property, to give effect to Tom's wishes. What passed between Tom and his mother in the talks which they must have had concerning the property, we, of course, do not know, but it is a matter of some significance that, when Mrs. McCombs decided to deed to her son and daughter, respectively, portions of her property, she divided between them so much thereof as had always remained in her name, and did not encroach upon that which had belonged to Tom. However that result came to pass, it is the fact that Mrs. McCombs' children have that portion of the family property which Mrs. McCombs always owned, while the remainder, which had been conveyed to Tom, goes in accordance with his wishes, as expressed in his testament.

The one fact that stands out most clearly throughout all the evidence is the forceful character and strong, clear mind of Josephine McCombs. Her intimate friends all testify to her strong intellect and clear mentality. She was rather dominating; her daughter testified that in all her life she had never disobeyed her mother.

Appellants make much of some testimony to the effect that Mrs. McCombs did not carefully read her will of August 21, 1929, before signing it. Mrs. Bolin, testifying for appellants, stated that she was present when respondent Palmer submitted this will to Mrs. McCombs, and that Mr. Palmer said, "Shall I read it to you, or will you read it yourself?" to which Mrs. McCombs answered, "I guess I can read it myself;" whereupon Mr. Palmer handed the document to her.

Mrs. Bolin then stated that Mrs. McCombs looked at the will and read, "turned it over" (meaning, we presume, turned a page), and read further, turning about three pages, and then said to Mr. Palmer, "I guess it's all right;" whereupon she signed the will. On cross-examination, however, Mrs. Bolin testified that Mrs. McCombs later told her that she had bequeathed five thousand dollars to Pearl, one thousand dollars to Roland, and fifteen hundred dollars apiece to the grandchildren. She also testified:

"Yes. She knew how much she had, and she stated to me how much she had; it was fifty-three acres that they had; that included Tom's also, it included the whole thing, the whole estate. She spoke of what part of it was Tom's and what part was hers, and she knew what was Tom's and what was hers, and she knew that on this day that the will was executed, and she discussed it with me even afterwards. Her mind was clear throughout, up until the time I left, and she had a strong mind."

Appellants strongly rely upon certain testimony to the effect that Mrs. McCombs stated that what was left of her property, after the payment of taxes, expenses, etc., was going to her children, and that, after the execution of the February codicil, she said that she had provided for the education of her grandchildren. Appellants do not contend that Mrs. McCombs was at any time wanting in testamentary capacity. From the evidence, it is inconceivable that she did not know the exact amount her children were to receive under her will of August 21st at the time she executed the same. The evidence introduced by appellants overwhelmingly shows that the February codicil was read to her. The revocation of the bequests to her children contained therein could not be misunderstood. The revocation of the bequests to the grandchildren is, of course, not so clear, but at the same time, we find no

sufficient ground in the record for reversing the hold-
·ing of the trial court upon that question.

The evidence introduced on behalf of appellants is
often in exact conflict with that introduced by respond-
ents. This opinion is already long, and to further re-
view and discuss the evidence would extend it beyond
all reason. On the facts, bearing in mind, as above
stated, that we hold that the burden of proof remained
throughout upon appellants, we conclude that the trial
court correctly ruled in respondents' favor.

■ Some further discussion of appellants' assign-
ments of error is necessary. Appellants contend that
the trial court abused its discretion in denying them
a trial to a jury. Such a proceeding as this is equi-
table in its nature (*Rathjens v. Merrill,* 38 Wash. 442,
80 Pac. 754), and the calling of a jury to sit in an
advisory capacity is entirely within the discretion of
the trial court. In this instance no abuse of discretion
appears.

■ We find no error in the rulings of the trial
court complained of by appellants under assignments
three and four. The court properly refused to permit
the introduction of testimony as to the mental con-
dition or testamentary wishes of the late James Mc-
Combs.

■ Under the fifth assignment, appellants contend
that the following incident constitutes reversible error.
Respondent E. B. Palmer was on the stand, and was
asked concerning a notation, the letter R, which then
appeared on the original will which had been admitted
to probate. He stated directly that he did not know
who made the notation. The following then occurred:

"Q. Is that your handwriting? A. It does look like
my handwriting; yes, I guess it is. (Witness asks for
a pad of paper.) THE COURT: Let's see, what are you
referring to? A. That 'R'. THE COURT: No, that is

mine. Mr. Merrick: I hope the rest of your testimony is as reliable as that. The Court: What is that? Mr. Merrick: It is a side remark, and I withdraw it. The Court: I will explain that. In checking over the original will with the codicil, in order that I might read the two together, I put the letter 'R' in pencil opposite that paragraph in the will which was revoked by the codicil. Mr. Brethorst: I did not know. When I picked it up I saw it on there, and I wanted to see what it was. The Court: It was done for checking purposes only. A. It looks very much like my 'R's'. Mr. Brethorst: I think the reporter has Mr. Palmer's statement. What was it you said there? A. I was going to write an 'R' to see— Mr. Brethorst: What was your statement? Mr. Merrick: I object to that unless it has a bearing on this case. The Court: Overruled. A. I was in doubt about the 'R' being my signature or my writing, and I was going to make an 'R' on a card and compare it, and I asked the Court if I might have the pad to do so. Mr. Brethorst: Now, I want the record to show that. A. Perhaps it was so low that neither the Court nor the stenographer heard it. (Motion to strike testimony regarding the 'R' denied.)''

Appellants contend that the court, by its interruption of the witness, prevented him from testifying that he had made the notation on the will, and thereby saved the witness from testifying ''to an untruth which would have discredited his whole testimony.'' The action of the trial judge in calling attention to the fact that he himself had made the notation on the original will was perfectly natural and spontaneous, and we fail to find that in so doing the court is subject to any criticism. In any event, the error, if any can be imagined, cannot be remedied, unless this court should say that respondents should be punished for the court's error by having this court direct a decree in appellants' favor. A new trial would avail appellants nothing, as, upon such trial, appellants would

have no greater right than the right of cross-examination of respondent Palmer, which right they have already exercised fully. We find no merit in this assignment.

We are satisfied that the decree entered by the trial court was right, and the same is affirmed.

TOLMAN, C. J., PARKER, FULLERTON, and BEELER, JJ., concur.

### ON REHEARING.

[*En Banc.* February 8, 1932.]

PER CURIAM.—Upon a rehearing *En Banc,* the court adheres to the Departmental opinion heretofore filed herein. Affirmed.

[1]Reported in 2 P. (2d) 727.