[No. 27245.   Department One.   December 14, 1938.]

*In the Matter of the Estate of* ROBERT JOLLY, *Deceased.*[1]

*Thomas G. Jordan* and *J. C. McCoy,* for appellants.

*Edgar P. Reid,* for respondents.

BLAKE, J.—Robert Jolly died July 12,. 1937, leaving in existence two wills, executed within six months prior to his death.   In the first, executed January 13th,

[1]Reported in 85 P. (2d) 267.

he named James D. Grose, Jr., as residuary legatee, and John F. McCarthy as executor. In the second, executed May 13th, he named Thomas Garrett and Alice Garrett as residuary legatees, and designated the former as executor.

The former will was admitted to probate July 14, 1937. A petition presenting the latter will for probate was filed August 7, 1937. Grose and McCarthy filed an answer to the petition, in which they objected to the probate of the second will on the grounds (1) that it had not been duly executed and attested; (2) that it was executed as the result of undue influence brought to bear on the testator by the residuary legatees; (3) that the testator was mentally incompetent.

The contestants, Grose and McCarthy, made a request for a trial by jury, which the court granted. The court submitted to the jury only the issue of the mental capacity of the testator. To the question:

"Did Robert Jolly on the 13th day of May, 1937, at the time he signed the will dated that date, have mental capacity sufficient to make a last will and testament . . .;"

the jury answered, "No."

After denying motions for judgment and new trial, interposed by the proponents, the court entered a judgment containing findings to the effect that the will had been executed, witnessed, and authenticated in the manner and form required by law, and that the testator "was not acting under duress, menace, fraud or undue influence of any person or persons whomsoever." The judgment then contains the following recital:

"On the question of mental capacity of the said Robert Jolly, deceased, to make a last will and testament at the time he in fact signed said document dated May 13, 1937, purporting to be his last will and testament, as aforesaid, the court feels there are so many elements in the case that he would not be justified in

disturbing the finding of the jury and therefore accepts the finding of the jury as to the lack of mental capacity of the said decedent to make his alleged last will on May 13, 1937."

The proponents have appealed from a decree rejecting the will.

■ We do not understand that the contestants question the finding that the will was executed in the manner provided by law. While they do make some contention here that the will was executed under undue influence brought to bear upon the testator by the proponents, we think the evidence falls far short of establishing the fact. All that can possibly be said of the evidence on this issue is that the proponents had the opportunity of bringing undue influence to bear. The opportunity alone, however, is not sufficient basis for drawing the inference that undue influence was exerted. *Points v. Nier,* 91 Wash. 20, 157 Pac. 44, Ann. Cas. 1918A, 1046; *In re Bradley's Estate,* 187 Wash. 221, 59 P. (2d) 1129. In the light of what was said in the cases cited, we may say that we do not think the evidence in this case was sufficient to raise even a suspicion that the testator was acting under undue influence.

■ With respect to the recital in the judgment concerning the mental incapacity of the testator, it would seem that the court accorded the verdict of the jury rather more weight than the law contemplates in such cases. For the verdict is merely advisory. *In re McCombs' Estate,* 164 Wash. 339, 2 P. (2d) 692. It does not relieve the court of the responsibility of weighing the evidence. *Hodgen v. Department of Labor & Industries,* 194 Wash. 541, 78 P. (2d) 949. Consequently, we have felt it incumbent upon us, in examining the record, to consider the credibility of witnesses, as well as the weight of the evidence.

So far as the numerical weight of the testimony goes, it overwhelmingly preponderates in support of the mental capacity of the testator. Likewise, with respect to the credibility of the testimony of the interested witnesses—Grose on the one side, and the Garretts on the other—the balance swings with the proponents. For with Grose there is an extravagance of statement running throughout his testimony which, to say the least, stamps it with a lack of sincerity. On the other hand, there is a simplicity, a spontaneity of expression, running through the testimony of each of the Garretts, which carries the ring of truth.

There is, running through the testimony of witnesses presented by the proponents, the same characteristic of directness and sincerity; while in the testimony of the contestants' principal witness, we find the same vein of extravagance as found in the testimony of Grose. This witness endeavored to bring out the fact that a great affection existed between the testator and Grose, who was the former's step-grandson. But this testimony is not convincing. For it was asserted, with no denial, that Grose, since his grandmother's death six years before, had seen Jolly but twice. So we find nothing in the record which would justify the conclusion that the cutting off of Grose was an unnatural act on the part of Jolly. On the other hand, we have the testimony of a disinterested witness to the effect that Jolly repeatedly stated that no one had ever treated him so well as did Mr. and Mrs. Garrett.

The testimony of only one other witness called by contestants need be noticed. By him it was sought to show that, at about the time the second will was executed, Jolly's memory had badly deteriorated. A year previous, the witness had borrowed some money from Jolly, to secure which he executed and delivered a mortgage. The witness testified that, six or seven days

after the interest payment became due, he had a conversation with Jolly, during the course of which the latter complained that no mortgage had been given, as agreed. The fact was that the mortgage had been delivered and was then in Jolly's possession. We attach little significance to this incident, particularly in view of a slight aberration on the part of the witness concerning the time of the loan. Although he testified quite positively that the conversation referred to occurred six or seven days after the interest payment was due, the fact was established that the conversation took place twenty-seven days after that date.

Turning now to the case made by the proponents, we find that they produced a number of disinterested witnesses, whose testimony is in no way impeached, who testified that the testator was mentally competent. The fact is so conclusively established by two of such witnesses that we shall briefly advert to their testimony.

But first, we shall outline a few undisputed facts concerning the life of the testator and the execution of the two wills. At the time of his death, the testator was seventy-four years of age. He left no direct heirs. He had been totally blind for more than thirty years. October 29, 1936, he suffered a stroke, from which he was confined in a hospital until the middle of December. He was then taken to his home, where for two weeks he was under the care of one Gordon. In the last days of December, he met, through Gordon, Mr. and Mrs. Garrett. He made arrangements with them to come and live in his home and take care of him. Under the agreement, he was to pay them forty dollars a month and all living expenses.

At about that time, he sent word to Mr. McCarthy that he wanted to make a will. Mr. McCarthy called on two different occasions, but, believing Mr. Jolly

incompetent at those times, declined to draw a will. By January 11th, however, Mr. McCarthy became satisfied that Mr. Jolly had regained his mental faculties sufficiently to know what he was about, and drew the will in which the contestant Grose was named residuary legatee. To obviate all doubt with respect to Jolly's mental capacity, Mr. McCarthy called in Dr. Frank P. C. Davis, who had attended the former during his recent illness.

This will, witnessed by Mr. McCarthy and Dr. Davis, was executed on January 13th. So, as of that date, there can be no doubt in anyone's mind about Jolly's mental capacity. For the only interest the contestants have must of necessity rest in the validity of that will. Therefore, the presumption of testamentary capacity, before questioned, arises and continues until overcome by evidence clear, cogent and convincing. *Dean v. Jordan,* 194 Wash. 661, 79 P. (2d) 331. Upon this presumption alone, the testamentary capacity of Mr. Jolly as of May 13th might well be rested. For there is no evidence whatsoever of another stroke until three or four days before his death, when he began to manifest symptoms of brain hemorrhage. The final stroke came the day before his death, when he suffered a complete paralysis.

But we do not have to rest our finding of testamentary capacity upon the presumption. As we have said, the weight of the testimony, both with respect to numbers and credibility of witnesses, overwhelmingly establishes the fact of testamentary capacity. We shall advert to the testimony of but two witnesses, whose disinterestedness is not open to question—Dr. F. P. C. Davis and Thomas Van Noy. Dr. Davis, who, it is to be remembered, witnessed the will of January 13th, testified that he saw Jolly May 13th, 18th, and June 3rd, and treated him for eczema. To

the following question: "Did he appear to you to be mentally just as bright and sane as he was on January thirteenth on those days?" he gave this answer: "As far as my observation of him, he was, yes." Dr. Davis further testified that Jolly impressed him as a naturally strongminded man; that, as early as December 21st, he had regained a normal mental condition; that thereafter Jolly's mental condition was normal every time the witness saw him.

Thomas Van Noy, postmaster at Kelso, testified as follows:

"Q. Were you acquainted with Robert Jolly in his life time? A. Yes, in a way I was. Q. Did you have some transaction with him about the fourth of May of this year? A. Yes, sir. Q. Where did that take place? A. That took place in Mr. Jolly's home. Q. Tell the court and jury what occurred, what was said between you and what happened. A. On the fourth of May Mr. Garrett came to me and told me Mr. Jolly had some money he wanted to put in the post office, or invest in bonds or postal savings certificates, and I went up to the house and saw Mr. Jolly to talk it over with him about how he wanted to invest it, and we figured out how he would invest it, so much in bonds and so much in postal savings. Q. Who did you talk with, when you say we figured it? A. Mr. Jolly. Q. What was the decision that was reached? A. Well, he decided how many bonds he wanted and how much money he wanted to invest in bonds and how much in postal savings certificates. Q. How long did your conversation with Mr. Jolly last on that occasion? A. I could not say just how long, but I think I was up there at least a half hour on that occasion, possibly longer. Q. Were you there on any other occasion. A. Yes, I was there again on the afternoon of the same day. Q. What happened at that time. A. That is when I went to deliver his bonds and his certificates to him. Q. Was there anything—did you have any conversation with him at that time? A. Yes, I had quite a visit with him at that time. Q. What did you talk about? A. We talked about bonds and certificates and how much

they amounted to, and I kind of joshed him that even though he was blind he was pretty good in fixing things up right. Of course, I can not recall all our conversation, but I visited with him quite a little while. . . . Q. In those conversations with Mr. Jolly that day, what would you say as to his mental condition, whether it was—whether he was mentally sound or unsound? . . . A. That is the first time I had conversation with Mr. Jolly, without helping him across the street. I had known him when I saw him a few years back and I would often help him across the street when I would see him coming to a corner, and of course I would talk a few words with him, but the conversation with him on that day,—why of course I had no reason to doubt his sanity at all; there was not anything that came up to cause me to doubt his sanity in any way. Q. Were the things that he said and the questions that he asked intelligent? A. Yes. I do not remember anything otherwise. Q. As though they came from a normal mind? A. Yes. I am sure that is my impression; I did not think of anything being wrong. Q. Was there anything about his demeanor or actions or anything he said or did that would indicate to you he was not of sound mind on that date? A. No, there was not."

From the undisputed facts and from the testimony of these witnesses—to say nothing of the testimony of other disinterested witnesses produced by the proponents—we are convinced that, at the time of the execution of the will dated May 13, 1937, Mr. Jolly possessed testamentary capacity.

The judgment is reversed, and the cause remanded with directions to admit that will to probate.

STEINERT, C. J., MAIN, GERAGHTY, and ROBINSON, JJ., concur.