[No. 32514. Department Two. December 16, 1953.]

*In the Matter of the Estate of* FRED O. PETERS, *Deceased.*[1]

[1]Reported in 264 P. (2d) 1109.

*Eggerman, Rosling & Williams* and *Joseph J. Lanza,* for appellant.

*Abrams, McCush & Rinker,* for respondents.

HAMLEY, J.—This is a proceeding to contest the lost or destroyed will of Fred O. Peters. He died in Bellingham, Washington, on May 21, 1951, at the age of seventy-one years. He was a widower at the time of his death; and left surviving him a daughter, Mildred Hall, a son, Clifford G. Peters, four brothers, William G., Charles A., Howard W., and Dr. John H. Peters, and three grandchildren.

Mildred Hall is the contestant, and is supported in her position by her brother, Clifford G. Peters. The will is defended by the four brothers of decedent and by Bellingham National Bank, which is administrator with the will annexed. The will is contested on three grounds, namely: (1) The provisions of the will were not proven by two witnesses from their own personal knowledge; (2) lack of testamentary capacity; and (3) undue influence. The trial court rejected all three grounds and entered a decree dismissing the petition with prejudice. Contestant appeals.

Decedent was engaged in the real-estate business in Bellingham for many years. In 1941, his marriage terminated in divorce. From then until December, 1948, except for a two-year period when he shared his home with a friend, Lyle Gandy, decedent lived alone. In 1945, he retired from his business on account of his health. He was suffering principally from the effects of syphilis contracted in early manhood, but also had arthritis and perhaps other ailments. A clinical examination made by Mason Clinic in Seattle, in April, 1945, showed that decedent was suffering from cerebral spinal syphilis, active and progressive.

After two fainting spells in November and December, 1948, decedent was taken to St. Francis hospital, in Belling-

ham. He remained there until his death two and a half years later, except for three or more sojourns in St. Luke's hospital, in Bellingham, while receiving surgical or special medical attention.

For the last several years of his life, all of decedent's deposited funds were maintained in joint bank accounts with his son, Clifford. The son also had custody of decedent's jewelry and was in general charge of his father's affairs. Clifford and his sister, Mildred, testified that they visited decedent at the hospital whenever practicable. Their father, however, complained to others that they did not visit him as much as they should have, and that the son was un-co-operative in other respects. Decedent at no time discussed with them his plan to make a new will, replacing a hand-written will which he had executed in 1942 (but which did not come to light until after his death). Decedent did, how-ever, mention to some of the nurses and friends who called to visit him that he was planning to make a will.

The will was prepared in March and April, 1951, by George Livesey, Sr., an attorney in Bellingham, who had represented decedent at infrequent intervals for many years. Livesey went to the hospital on this matter in response to decedent's telephoned request. At the first conference be-tween them, decedent gave Livesey a typewritten memo-randum containing a description of several parcels of real property. He also gave Livesey a typewritten memorandum, which had been prepared by Clifford, listing decedent's bank accounts and other assets, and placing a value on each item. Decedent told Livesey at that meeting how he wanted the property disposed of.

A draft of the will was prepared, and Livesey read it to decedent during a second visit. Decedent then noticed an error in a description of one of the parcels of real estate mentioned in the will, whereby reference to a certain six-teen-foot strip of land had been inadvertently omitted. One or two more drafts were thereafter prepared. George Live-sey, Jr., who is associated with his father in the practice of law, accompanied his father on one of these trips to the

hospital. Decedent's brother John testified that he was given one of the drafts of the will and went to the hospital and read it to decedent two or three times, but made no suggestions of his own.

George Livesey, Sr., and a nurse were the only witnesses to the execution of the will on April 14, 1951. At this final session, Livesey advised decedent that Clifford ought to be dealt with more generously. Recalling that his brother Howard was the beneficiary of decedent's five-thousand-dollar life insurance policy, decedent then asked Livesey to shift a five-thousand-dollar bequest from Howard to Clifford. This was done by interlineation.

After the will was executed, decedent gave it to Livesey, who retained it until after decedent's death. Livesey testified that he delivered the will to Clifford on June 21, 1951. Clifford denied this, and failed to produce the will in response to a court order. John thereupon petitioned the court for an order admitting to probate, as a true copy of decedent's lost or destroyed will, a document attached to the petition as an exhibit. After a hearing, a decree was entered admitting such document to probate as decedent's will.

Regarding decedent's testamentary capacity on April 14, 1951, when the will was executed, testimony was given by two doctors, four nurses and fourteen lay witnesses. It will not be practicable here to indicate more than the general purport of this testimony.

George Livesey, Sr., George Livesey, Jr., and John, all of whom testified that they were present during one or more of the conferences with decedent regarding his will, expressed the opinion that he had testamentary capacity at those times. The nurse who was the other subscribing witness was not called to testify in the instant proceeding.

Two doctors, both called by appellant, testified as to decedent's mental competency. One of these was Dr. Lyle A. Greenwood, of Bellingham, who had been treating decedent at intervals since the 1920's for his syphilitic condition. Dr. Greenwood devotes his time principally to internal medicine and general practice. The other doctor who testi-

fied was Dr. Wayne W. C. Sims, of Seattle. He specializes in dermatology and syphilology.

Both doctors diagnosed decedent's condition as general paresis of the insane. This is one of the later manifestations of syphilis. Persons so affected suffer a cellular destruction of brain tissue, which brings about a gradual deterioration in the mental faculties. As a result, such individuals lose their memory, especially as to recent events; their judgment is weakened; they become more "suggestible"; they are apt to make mistakes in business, to squander their assets, and to make impulsive decisions.

It was Dr. Sims' opinion that, in April, 1951, decedent did not have sufficient mental capacity to know in detail and at one time the extent and nature of his property. Dr. Sims thought that decedent might be able to remember his relatives and the natural objects of his bounty on one day, and might not be able to do so the next day. In this connection, the witness remarked: "Syphilis can fool us occasionally." Dr. Sims thought it would be "physiologically impossible" for decedent to understand a four-page will which was read to him.

Dr. Sims had never seen decedent. His opinion testimony was based exclusively upon the fact that the 1945 report of Mason Clinic showed progressive paresis, and that death occurred six years later at the age of seventy-one years, decedent having lost his vision in the meantime. The hypothetical question to which he responded did not take into consideration any facts regarding decedent's physical condition (other than loss of vision), acts, or conduct, between 1945 and 1951.

Dr. Greenwood's opinion as to decedent's mental competency to make a will was based not only on the Mason Clinic report, but also on personal knowledge gained over a long period of time as decedent's physician. As tending to support the opinion which he expressed, Dr. Greenwood stated that, towards the end, decedent was not interested in his surroundings, and was either asleep or "dopey" a good deal of the time, apparently due to an excessive use of sleeping

tablets. He also referred to an occasion when decedent indicated a desire to give away some of his less valuable diamonds to persons outside the family. Dr. Greenwood testified that he was always recognized by decedent when a hospital call was made.

It was Dr. Greenwood's testimony that decedent was not mentally sound during the period of hospitalization. He did not, however, express a categorical opinion that decedent lacked testamentary capacity during all of that period, or on the day on which the will was executed. In the main, he merely questioned or doubted decedent's mental competency. Typical of his testimony in this regard is the following:

"Q. [Direct examination] Doctor, can you say that, at any time during the period of his hospitalization, he was of sound mind? A. Well, my opinion in these cases is that an individual who has this type of spinal fluid, his actions are always subject to scrutiny and question because at some time his behavior is going to be abnormal. Otherwise, this disease would not be called general paresis of the insane, so I feel that his acts are subject to question. . . .

"Q. Do you feel that he was mentally sound during that period of hospitalization? A. I don't think he was mentally sound, no. Q. Do you think he could have been mentally sound at any time during that period? A. That is a question. I don't know, but I feel that, from 1948 on, his condition is such that any of his acts are subject to very close scrutiny, as to whether they represented what he would want to do if—oh, twenty years before. Q. Well, do you think such an individual as Mr. Peters, suffering from that disease in the terminal stages, could possibly have retained the memory of his property in detail as to what he owned, or what he wanted to do with it? A. I doubt it very much. I doubt if he would have the memory to let him do that. Q. Can such a person with such a disease exercise sound judgment in any types of business transactions at all? A. Well, we are taught that they are not capable of so doing. . . .

"Q. [Cross-examination] And if Mr. Livesey met and discussed with Fred Peters about a will, do you feel Mr. Peters would know it was a will he was talking about? A. That is just where the question comes in. I doubt if he had sound-

ness enough of mind at that time to intelligently distribute his property. . . .

"Q. Doctor, would it be true that a person in Fred Peters' condition there, that his condition would vary from day to day; some days he would be better than he would at other times? A. Yes. Q. Sometimes be able to carry on more intelligent conversation perhaps, and have better recognition of people about him and about the things around him, than he would at other times? A. Possibly so."

Four nurses who cared for decedent at St. Francis hospital were in general agreement that he could not carry on a normal conversation; that he talked a great deal about sex matters and past events; that his memory of current matters was very poor; and that these conditions became gradually worse as time went on. They further testified, however, that he usually recognized his nurses; seemed to know friends and relatives; frequently talked about the latter; carried on conversations over a telephone maintained at his bedside; could remember some telephone numbers; was able to feed himself most of the time; understood the price of articles which were purchased for him; and could count change which was returned to him.

Two of the nurses expressed the opinion that decedent was not mentally competent during any of the time he was at the hospital. Another expressed the opinion that decedent would have been unable to understand a four-page will. On the other hand, some of the testimony submitted by the nurses would tend to indicate that decedent did have lucid intervals. One nurse, for example, stated that decedent was more wide awake and his mind more clear some times than at other times. She also expressed the opinion that decedent would know that he was signing a will, but afterwards "he might forget it." All four nurses testified that sometimes decedent's conversation was coherent and sometimes it was not.

In general, the relatives who were interested in breaking the will testified that decedent did not have testamentary capacity, while those who had a contrary interest testified the other way.

Four disinterested lay witnesses, who had visited decedent at the hospital from time to time, expressed the opinion that decedent was mentally competent. Three of these witnesses testified, in effect, that decedent knew the nature and extent of his property and the natural objects of his bounty. The fourth of these witnesses, a fifteen-year-old boy, did not express an opinion as to this, but told of a conversation with decedent the night before death occurred, in which decedent dictated a memorandum setting out his wish to be cremated and to have his ashes buried next to his mother. A fifth disinterested lay witness testified that decedent talked incoherently at times, but that he would know his relatives and the extent of his property.

In addition to the foregoing, there was testimony concerning highly unusual conduct by decedent in 1945, while visiting his daughter in Seattle; the filthy condition in which he maintained his home for the last few years before he went to the hospital; the secretion of large sums of money on his home property; irritableness and constant complaining at the hospital. This latter conduct may be explained, at least in part, by reason of the fact that decedent was in considerable pain and discomfort at the hospital, due to a series of ailments, infections, and accidents.

As before indicated, appellant advances three separate reasons why, in her view, the will which has been admitted to probate should be set aside. The first of these, as set out in appellant's first cause of action, is that the provisions of the will were not "clearly and distinctly proved by at least two witnesses," as required by the statute relating to the proof of lost or destroyed wills. RCW 11.20.070 [cf. Rem. Rev. Stat., § 1390].

The trial court did not deal with this contention on its merits. Instead, it was held that the decree admitting the will to probate is *res judicata* as to that question. That decree was based upon a specific finding of fact therein made, that the provisions of the will "have been clearly and distinctly proven" by the testimony of attorneys George Livesey, Sr., and Burton A. Kingsbury.

■ A decree admitting a will to probate is not *res judicata* as to persons who do not actually appear in the probate hearing but appear for the first time in the will contest, concerning any issue which may be litigated therein. *In re Hall's Estate,* 34 Wn. (2d) 830, 210 P. (2d) 406.

Appellant was not properly notified of the probate hearing, and appears for the first time in this will contest. It follows that, if the question as to the sufficiency of the proof concerning the provisions of the lost will may be properly litigated in a will contest, appellant is not precluded from doing so on the theory of *res judicata.*

The matters initially determined in a proceeding to probate a will which may be re-examined in a subsequent will contest are specified in RCW 11.24.010 [*cf.* Rem. Rev. Stat., § 1385]. This section provides that issues shall be made up, tried, and determined (1) respecting the competency of the deceased to make a will; (2) respecting the execution of such will by a deceased under restraint or undue influence or fraudulent representation; or (3) "for any other cause affecting the validity of such will."

■ The term "validity," as used in this last clause, has reference to the genuineness or legal sufficiency of the will under attack. It raises the question of whether the will is legally sufficient in form, contents, and compliance with the statutory requirements as to execution. *In re Elliott's Estate,* 22 Wn. (2d) 334, 156 P. (2d) 427, 157 A. L. R. 1335.

In our view, any question having to do with the provisions of a lost or destroyed will relates to the genuineness of the will and the legal sufficiency of its contents. We therefore conclude that the question of whether the provisions of the will have been "clearly and distinctly proved by at least two witnesses" (RCW 11.20.070) may be raised in a will contest. The doctrine of *res judicata* therefore has no application in this case.

■ This brings us to the merits of the question as to the sufficiency of proof concerning the provisions of the lost will. At the probate hearing, respondents offered two witnesses on this matter. One of these was George Livesey,

Sr. He identified a document which was introduced in evidence as a true, correct, and complete copy of a will which decedent executed in his presence, and which he signed as an attesting witness. This satisfied the statutory requirement, in so far as one witness is concerned, and appellant does not contend otherwise. See *In re Auritt's Estate*, 175 Wash. 303, 27 P. (2d) 713.

The other witness as to the provisions of the will was Burton A. Kingsbury. Appellant argues that his oral testimony, which was reduced to writing, is insufficient, because he did not testify that he witnessed the execution of the will. We do not reach that question as to Kingsbury, however, as his testimony is clearly deficient in another important respect.

This witness testified that he saw and examined an original will signed by F. O. Peters and acquainted himself with most of its provisions. He further stated that the instrument which he examined was typewritten, signed in ink by F. O. Peters, and witnessed by George Livesey, Sr., and Mrs. H. A. Baklund. But Kingsbury did not testify as to what were the provisions of that will. Nor did he identify the will which was introduced in the probate proceeding as a copy of the will which he examined. It is therefore clear that his testimony did not "clearly and distinctly" prove the provisions of the will, as required by the statute.

In the course of the will contest, Livesey testified regarding the provisions of the will substantially in accord with his testimony at the probate hearing. Kingsbury was not a witness in the will contest. Respondents, however, offered Mrs. Grace Buckner, a former secretary in Mr. Livesey's office, as an additional witness to prove the provisions of the lost or destroyed will.

Mrs. Buckner testified that she prepared several drafts of a will intended for execution by decedent; that sometime thereafter, Livesey handed her the original of the last of these drafts; that this original appeared to have been signed by decedent and the two attesting witnesses; that it was evident that the signature of "F. O. Peters" was made by a

very sick and weak man, because it was a very poor though legible signature; that this original also had some hand-written interlineations therein; that she thereupon made an original exact copy and about five carbon copies of this executed draft, incorporating the interlineations in the body of the draft; and that the document which was admitted to probate is one of the carbon copies which she so prepared.

On the basis of the testimony of Livesey and Mrs. Buckner, offered in the will contest, the trial court found that the provisions of the lost or destroyed will were testified to "and sufficiently proven by two witnesses in this contest proceeding."

█ Appellant argues that respondents were not entitled to produce Mrs. Buckner as an additional witness regarding the provisions of the will. It is her position that compliance with the statutory standard as to such proof must stand or fall on the testimony received at the probate hearing. She contends that, if respondents feel that Mrs. Buckner's testimony will supply the asserted deficiency in testimony taken at the probate hearing, their recourse is to start a new probate proceeding.

We do not agree with this contention. If the issue is not *res judicata,* as we have decided, then both parties to the will contest, and not just the contestant, may adduce additional evidence on the matter in the will contest.

Appellant also makes the same argument regarding Mrs. Buckner's testimony that she did with regard to Kingsbury's testimony in the probate hearing, namely, that since Mrs. Buckner did not see decedent execute the document which was later given to her for copying, she does not know of her own knowledge that the document she examined was, in fact, decedent's last will.

Respondents seek to dispose of this argument by citing *In re Auritt's Estate, supra.* In that case, the testimony of a secretary who had examined the executed draft of a will which she had herself prepared was held to be sufficient. In that case, however, the witness also testified that she

had witnessed the execution of the will. The cited case is therefore not determinative, and it is necessary to review the proposition on principle.

██ The language of RCW 11.20.070, requiring that the provisions of a lost or destroyed will be clearly and distinctly proved by at least two witnesses, is mandatory and cannot be disregarded by the courts. *In re Harris' Estate,* 10 Wash. 555, 39 Pac. 148. It has accordingly been held that the two witnesses required by statute must each be able to testify to the provisions of the will from his or her own knowledge, and not from the declarations of another, even of the testator himself. *In re Needham's Estate,* 70 Wash. 229, 126 Pac. 429; *In re Calvin's Estate,* 188 Wash. 283, 62 P. (2d) 461.

Mrs. Buckner, of course, did not rely on the declarations of others in testifying as to the *provisions* of the document. She herself prepared the document and she personally examined it, including the interlineations, after it had been executed. She was not present at the execution of the will, however, and did not have direct personal knowledge that the document which she prepared and later examined was actually the will of Fred O. Peters. Appellant argues that, unless such witness actually saw or witnessed the execution of the document, the statutory standard has not been met. In support of this view, principal reliance is placed upon *In re Needham's Estate, supra.*

In that case, the lost will was alleged to have been executed in March, 1893. As one witness to prove the provisions of this will, as well as its execution, petitioner called J. M. Adams, an attorney. An offer of proof was made that this witness would testify that, in about 1901, the decedent showed him a paper for the purpose of procuring advice relative thereto; that decedent stated to Adams that it was his will; that Adams then examined the paper and became familiar with its contents; that it purported upon its face to be a will of the deceased, duly executed by him about the year 1893; and that Adams was able to state its contents and provisions from the knowledge thus obtained. The trial

court rejected the offer of proof, and refused to admit the lost will to probate. This court affirmed, saying with regard to the above offer of proof:

"The offered testimony of the witness Adams would not have amounted to the testimony of one witness such as the statute contemplates, for it was based entirely upon what he was told by the deceased. He knew nothing either of the execution or contents of the will save as told to him by the deceased. . . .

"A witness who testifies only to what he learns from statements made by the testator is really giving only hearsay testimony. He could not be said to be testifying to the provisions of the will, but only to what another had stated its provisions to be. We think the two witnesses required by the statute must each be able to testify to the provisions of the will from his own knowledge of its contents. Otherwise its provisions would not be proven by two credible witnesses." (pp. 232-233)

It will be observed that the rule thus announced is predicated on the supposition (contrary to the stated facts of that case and this) that the witness knew nothing of the contents of the will save as told to him by the deceased. Accordingly, the rule announced in *Needham* has always been understood to apply to a situation where the witness made no claim that he personally examined the original executed will. See *In re Auritt's Estate, supra*; *In re Calvin's Estate, supra*; 126 A. L. R. 1139, 1149, 1172.

It is therefore apparent that the rule, as so understood, does not militate against the trial court's conclusion in the instant case that Mrs. Buckner's testimony was legally sufficient. Her knowledge of the contents of the document was not dependent upon what anyone told her, but was based upon her own examination.

It is only when the *result* reached in *In re Needham's Estate* is considered in relation to the facts of that case, *rather than the rule applied in the opinion,* that it can be regarded as authority in support of appellant's position. The witness Adams did actually examine the paper, after being told by the decedent that it was decedent's will. That is stronger proof that the instrument examined was actually

the will of decedent than we have in this case. But, as before noted, the evidence was rejected, not because the witness did not personally see the will executed and took decedent's word for that, but on the mistaken ground that the witness had no knowledge of the *contents* of the will save as told to him by decedent.

In view of the seeming misapprehension as to the facts under which the court acted in *Needham*, we cannot regard that case as controlling on the proposition before us. That case, it may be said, has never been cited by this court for the proposition that a witness as to the provisions of a lost will must have actually witnessed its execution. Thus, while the result in *Needham* was correct, as the opinion indicates that the *execution* of the will was not adequately proved, we do not believe that the court intended to lay down the rule contended for by appellant.

█ In our opinion, the clear and distinct proof referred to in the lost wills statute (RCW 11.20.070) relates only to the provisions of the instrument, and not to its execution. Proof as to the execution of the instrument is dealt with in the first paragraph of that statute and in other statutes. RCW 11.20.020, Rem. Rev. Stat., § 1380; RCW 11.20.040 [*cf.* Rem. Supp. 1945, § 1382]. Execution of the will was proved by the written testimony of George Livesey, Sr., and Mrs. H. A. Baklund in the prior probate proceedings, and has not been challenged in this action.

█ It is, of course, necessary that the trial court be satisfied that the document which the witnesses have examined and on the basis of which they have testified as to its provisions, is in fact the original executed will. But there is no statutory requirement that each of the two witnesses as to the provisions of the will have direct personal knowledge of this. Nor is it necessary that the proof as to this rest exclusively upon the testimony of these two witnesses. The quantity and quality of the evidence as to the authenticity of the examined document which will prove convincing to the trial court rests within its sound discretion.

█ In this case, there is the written and oral testimony

of George Livesey, Sr., and the written testimony of Mrs. H. A. Baklund that decedent executed a will on April 14, 1951, and that they were the attesting witnesses. There is the testimony of Livesey that, prior to execution, certain interlineations were made in this will. He testified that the document admitted to probate was a true and exact copy of this will. He further testified that, after this will was executed, he handed it to Mrs. Buckner for the preparation of copies. Coupling this evidence with the testimony of Mrs. Buckner, summarized above, we cannot say that the trial court should not have been convinced that the document Mrs. Buckner examined was the original executed will of decedent.

We therefore conclude that the trial court did not err in holding that the provisions of the will were clearly and distinctly proved by two witnesses in this contest proceeding.

The second question presented on this appeal is whether the trial court's finding of fact that, at the time of executing his last will, decedent was mentally competent to execute a valid will, is contrary to the clear preponderance of the evidence.

The test of testamentary capacity, as frequently stated by this court, is whether, at the time the will was executed, the testator had sufficient mind and memory to understand the transaction in which he is then engaged, to comprehend generally the nature and extent of the property which constitutes his estate, and to recollect the natural objects of his bounty. *In re Bottger's Estate,* 14 Wn. (2d) 676, 129 P. (2d) 518.

Since a probated will is *prima facie* evidence of the legality thereof (RCW 11.24.030 [*cf.* Rem. Rev. Stat., § 1387]), one who seeks to establish lack of testamentary capacity has the burden of proof. *In re McGhee's Estate,* 188 Wash. 550, 62 P. (2d) 1336. In order to sustain this burden, the evidence to overcome the presumption of testamentary capacity must be clear, cogent and convincing. *In re Jolly's Estate,* 197 Wash. 349, 85 P. (2d) 267. Where,

however, a condition of general insanity which is not of a temporary kind is once shown to exist, it is presumed to continue, and the burden of overcoming such presumption by proving mental restoration or a lucid interval shifts to him who asserts such facts. *Dean v. Jordan,* 194 Wash. 661, 79 P. (2d) 331.

Appellant's case for mental incompetency is based upon a consideration of the nature of the disease from which decedent was suffering; medical testimony as to the actual effect of the disease upon decedent; and miscellaneous circumstances, only a few of which it has been practicable to note in this opinion.

 The testimony, considered as a whole, leaves no doubt that decedent's mental capacity had been declining for several years prior to his death. Paresis, resulting from a long-standing syphilitic condition, was the cause, and by 1951 this paresis had reached its terminal stages. One suffering therefrom may have temporary remissions, but in general the condition is progressive, and there can be no permanent restoration of mental capacity.

As we view all of the evidence, however, the fact that one is suffering from a mental condition of this kind does not conclusively establish that there can be no periods of testamentary capacity in the legal sense. Moreover, there appears to be considerable evidence tending to establish that this decedent did have testamentary capacity when he conferred with his attorney regarding his will, and when he executed it.

There is testimony that on those and other occasions during the last months of his life, decedent was able to remember and recognize his relatives, and keep in mind the extent of his property. The dispositions which he made of his property were not abnormal. During the reading of one draft of the will, he noted an error in one of the property descriptions. He recalled that one brother was the beneficiary of a life insurance policy, and took this into account in directing the final revisions of the will. On the night before his death, he was rational enough to call on the telephone a boy who

lived near the hospital, and to dictate to him his wishes concerning cremation and disposition of ashes.

There was, of course, much evidence tending to offset that to which reference has just been made. We are unable to say, however, that this evidence. clearly preponderates against the findings of the trial court as to decedent's testamentary capacity.

The final question which we have to consider is whether the trial court erred in finding that decedent acted freely and voluntarily, without coercion or undue influence or persuasion from any person.

The principles to be applied in passing upon the question of whether a will has been vitiated by reason of undue influence are comprehensively set out in *Dean v. Jordan, supra,* and need not be repeated here.

Appellant brings to our attention certain facts in connection with this case which. she regards as of such suspicious nature as to raise a presumption of fraud. or undue influence. In this connection, she calls attention to the testimony regarding the following matters: the physical and mental condition of the testator; his asserted unrestricted and uncontrolled use of sleeping tablets supplied entirely in the latter stages by John Peters; the fiduciary and confidential relationship existing between the testator and John Peters and George Livesey, Sr.; the opportunity which John Peters and Livesey had to exercise undue influence; Livesey's testimony that the bequest of ten thousand dollars to Clifford "was entirely the result of my efforts"; the participation of John in the procurement of the will; and the asserted unnaturalness of the bequests to the three brothers.

In the light of our examination of the entire record, we are convinced that none of these matters, nor all of them considered together, are sufficient to justify a finding of fraud or undue influence. The idea of making a will originated with decedent. He advised Livesey as to how he wanted his property distributed. While he accepted Livesey's suggestion that decedent's son, Clifford, be dealt with more generously, that in no sense indicated an exercise of undue influence. Decedent's dissatisfaction with the way

contestant and Clifford had treated him may or may not have been justified, but there is no evidence that such feeling was promoted by John Peters or Livesey.

John was the most frequent caller at the hospital, and this very likely raised him in the esteem of his ill brother. But there is nothing to indicate that John sought to ingratiate himself for the purpose of receiving an undue share of the estate. He actually received under the will only one thousand dollars more than did each of his brothers.

If fraud or undue influence had actually been exercised, we would expect to find some indication of this in the way in which the property was devised and bequeathed. But such indication is wholly lacking. The value of the estate, based on figures set out in the will, is about $59,250. Of this, contestant received $2,500, her husband received $10,000, and her two children each received $2,500. Clifford, the other child of decedent, received $10,000 in cash, $5,750 in real estate, and the residue and remainder of the estate, which had a value of about $10,000 before payment of creditor's claims, taxes, and expenses of probate. Two brothers received property of the value of $5,075 each, and a third brother, John, received property of the value of $6,075. The fourth brother, Howard, received seventy-five dollars under the will and the proceeds of a $5,000 life insurance policy. Clifford was named executor.

In our opinion, the evidence does not clearly preponderate against the findings of the trial court on the question of fraud and undue influence.

The judgment is affirmed.

GRADY, C. J., SCHWELLENBACH, DONWORTH, and FINLEY, JJ., concur.