[No. 43459. En Banc. July 3, 1975.]

*In the Matter of the Estate of* PATRICIA VEGUILLA NELSON. JAMES R. NELSON, *as Administrator, Appellant,* v. GERALD F. COLLIER *et al, Respondents.*

*Gordon A. Livengood* (of *Powell, Livengood, Silvernale, Carter & Tjossem*), for appellant.

*Gerald F. Collier*, for respondents.

UTTER, J.—James Nelson appeals from a judgment admitting the lost will of his late estranged wife, Patricia Veguilla Nelson, to probate. He challenges the trial court's ruling on a number of issues, including the requirements for admission of a lost will to probate under RCW 11.20, the nature of a "marriage settlement" which prevents the

revocation of an antenuptial will as to the testator's spouse otherwise required by RCW 11.12.050, the validity of an unsigned contract under the statute of frauds, and the right to discovery in lost will contests. We hold that the trial court correctly decided all these questions and affirm its judgment admitting the will to probate.

In April 1966, the decedent, Patricia Veguilla Nelson, executed a will. The actual document which she executed was a carbon copy of a "ribbon" original kept in Washington, D.C. by the attorney who had prepared it for her there. The ribbon copy was never itself executed. The will did not mention appellant, whom decedent had not yet met, but provided that the bulk and residue of decedent's estate was to be held in trust for her minor daughter by a previous marriage.

In May 1970, appellant and decedent were married. In September 1971, they separated and decedent hired an attorney to represent her in dissolution proceedings. The attorney met several times with appellant and talked with him and with decedent regarding a property settlement agreement, which he ultimately prepared for them. The agreement disposed of substantially all the parties' property including their two homes, one of which was to go to decedent, the other to appellant. Appellant signed the agreement and a deed granting decedent the Seattle home, but when the contract was presented to decedent she objected to its contents and refused to sign. The settlement negotiations then broke down, and litigation between the parties was commenced to determine whether the property settlement agreement was binding—appellant contending that it was, decedent that it was not. This litigation was ongoing when decedent was murdered by a burglar who broke into her home. A search after her murder failed to locate the executed copy of her will.

In separate proceedings, appellant and respondent Gerald Collier were appointed to administer Ms. Nelson's estate. When the inconsistency of the two appointments was discovered the matters were consolidated, and motions were

filed by each side to dismiss the other from the case. During the pendency of these motions the parties were each enjoined from engaging in discovery until their resolution, which came when decedent's will, naming her mother executrix, was proven and admitted to probate under the "lost will" statute, RCW 11.20.070. This appeal is from the order admitting the will.

I

■ The threshold questions raised by appellant concern the trial court's finding that the requirements for admitting a lost will to probate under RCW 11.20.070 were met. That statute provides in pertinent part, that

[w]henever any will is lost or destroyed, the court may take proof of [its] execution and validity . . .

No will shall be allowed to be [so] proved . . . unless it is proved to have been in existence at the time of the death of the testator . . . nor unless its provisions are clearly and distinctly proved by at least two witnesses . . .

The language of this provision, and our cases interpreting it, establish four prerequisites to the admission of a lost will to probate: the will must have been lost or destroyed, but must have been in existence at the time of the testator's death; it must have been properly executed, and its contents must be proven "clearly and distinctly" by the testimony of at least two persons. *In re Estate of Gardner*, 69 Wn.2d 229, 417 P.2d 948 (1966); *In re Estate of Peters*, 43 Wn.2d 846, 264 P.2d 1109 (1953); *In re Estate of Harris*, 10 Wash. 555, 39 P. 148 (1895).

■ The trial court found each of these requirements satisfied. Except for the fact that decedent's will was lost or destroyed, appellant challenges all these findings. Since they were made from the same cold record of affidavits and depositions which has been filed here, and the court below did not have the opportunity to assess the credibility or weight of conflicting evidence by hearing live testimony, we should reassess its factual findings as well as its legal conclusions de novo. *See Smith v. Skagit County*, 75 Wn.2d

715, 718, 453 P.2d 832 (1969); *Carlson v. Bellevue,* 73 Wn.2d 41, 48, 435 P.2d 957 (1968).

### A.

■■■ There is little room for serious doubt that the trial court's decision was correct as to two of the necessary elements: proof of the will's contents and of its proper execution. It is uncontested that the formalities of execution and witnessing of the will were properly observed under Washington law—which is assumed to be identical to the law of the place of execution (apparently Virginia) since no foreign law was pleaded or proven in the court below. *Granite Equip. Leasing Corp. v. Hutton,* 84 Wn.2d 320, 324, 525 P.2d 223 (1974). Appellant objects that Ms. Nelson was not shown to have been mentally capable of making a will at the time she signed it; but a will like this one, rational on its face and legal in form, creates a presumption of testamentary capacity which there is nothing in this record to rebut. The required "clear and distinct" proof of the will's contents came from three persons, two of them witnesses to its execution and the third the attorney who drafted it. They testified that the unexecuted ribbon original of the will, which was admitted into evidence, was identical to the carbon copy that Ms. Nelson signed. We have twice before held virtually identical proof of contents adequate under this statute. *In re Estate of Peters, supra; In re Estate of Auritt,* 175 Wash. 303, 27 P.2d 713 (1933). We see no reason to depart from these holdings by finding this plainly persuasive proof inadequate here.

### B.

■■■ The question of the will's existence at the time of Ms. Nelson's death is somewhat closer. The proof that it did still exist, that decedent did not within her lifetime destroy it, was purely circumstantial. Three witnesses—her lawyer, her daughter and a friend—all recounted conversations that they had had with decedent a short time before she was killed which indicated that she would not have destroyed her will without making another. Decedent's actions seem to support this conclusion, as her minor daugh-

ter, to whom the will essentially devised all her property, continued to be the object of her affection and concern until her death. Further, the circumstances surrounding decedent's death provide a possible explanation of the whereabouts of her will which is consistent with its having been in existence at that time. The burglar who shot her took from her apartment a lockbox which he left broken open on the lawn outside. This box was apparently used by decedent as a repository for her valued papers, and may well have contained her will.

Although these facts hardly establish beyond doubt that decedent's will existed at the time of her death, they are persuasive enough to cause us to agree with the trial court's finding that it did. Proof on this issue, unlike proof of a lost will's contents, need not be "clear and distinct" and will often be largely circumstantial. *In re Estate of Gardner, supra* at 235; *In re Estate of Peters, supra* at 860. The statutory requirement of proof of existence simply codifies the common-law presumption that a will that cannot be found was destroyed animo revocandi, which may be rebutted by "evidence as to the testator's attitude of mind, as indicated by his declarations made between the time of executing the will and the time of his death . . ." *In re Estate of Auritt*, 175 Wash. 303, 308, 27 P.2d 713 (1933). Recognizing that the fundamental concern is the fulfillment of the testator's intent, we have in previous cases found evidence showing that a will was in existence at the time of death adequate, although it was far from overwhelming. For example, in *In re Estate of Auritt, supra*, we affirmed a trial court's finding that a will had been in existence which was based on the decedent's oral reaffirmations of her affection for and desire to devise to her brother, the prime beneficiary named therein, shortly before her death. In *In re Estate of Harris, supra*, statements by the deceased up to 2 weeks before his death that he had a valid will similar to the one offered to probate was held adequate to admit it. Here where there is the same kind of evidence as to intent, supplemented by the circumstances which may explain the

failure to locate the document itself, we hold that the preponderance of the evidence shows that the will was in existence at the time of Ms. Nelson's death and was not destroyed by her with the intent to revoke it.

## II

Appellant's next contention is that, even if the "lost will" was properly proven, it should not be probated because it was revoked as to him by his marriage to deceased after it was made. This argument centers on RCW 11.12.050, which provides in part:

> If, after making any will, the testator shall marry and the spouse shall be living at the time of the death of the testator, such will shall be deemed revoked as to such spouse, unless provision shall have been made for such survivor by marriage settlement . . .

Clearly, under the plain language of this statute, appellant's position must be sustained unless he is found to have been provided for in a "marriage settlement." But the trial court did so find, holding that the property settlement agreement entered into by appellant and decedent was valid and binding and satisfied this provision. Appellant attacks this holding on several grounds.

## A.

Two of appellant's arguments are insubstantial. One is his claim that the property settlement agreement he signed was not binding on Ms. Nelson because her attorney did not have the authority to agree to it on her behalf. Initially he premises this contention on the fact that decedent disavowed the agreement on this ground, while defending against his attempts to enforce it. He urges that her pleadings and statements to that effect are binding on her successors and therefore determinative of this issue. But even pleadings in a particular case, while admissible in evidence against the person making them, are not conclusively binding. *Schotis v. North Coast Stevedoring Co.*, 163 Wash. 305, 313, 1 P.2d 221, 78 A.L.R. 1427 (1931). Much less, then, can decedent's attempts to disclaim the agree-

ment bind her "successors"[1] in this separate proceeding. Decedent's statements in her attempt to avoid the agreement, like appellant's in his attempt to enforce it, constitute counterbalancing admissions which are only elements in the conflicting pattern of evidence on this question. The record in its entirety[2] leads us to the same conclusion that the trial court reached—that Ms. Nelson's attorney was actually authorized to enter into the agreement on her behalf.[3]

■ Alternatively, appellant claims that the death of the decedent, because it terminated the dissolution proceedings she was involved in, voids the property settlement agreement which was part of them. But the agreement, if binding, was not simply an adjunct of the dissolution litigation, but constituted a separate and distinct contract. We have previously held that contracts disposing of property upon marital separation survive the death of one of the parties unless the contract itself or the surrounding circumstances show it was not intended to. *In re Estate of Garrity*, 22 Wn.2d 391, 156 P.2d 217 (1945); *In re Estate of Martin*, 127

---

[1] Appellant's argument strangely seems to assume that respondent Collier, not he, is decedent's successor. This contention hardly squares with his ultimate claim that he, as the deceased's husband and the person entitled to the largest intestate share of her estate, should succeed to her interests despite the contents of her lost will.

[2] It is undisputed that decedent knew and approved of her attorney's efforts to draft and complete a property settlement agreement. Although she later said she did not authorize him to actually enter into a final agreement, his sworn testimony and the evasiveness of her answers on cross-examination indicate to the contrary. Moreover, the parties' actions, which speak louder than their words on this subject, support the conclusion that there was actual authority. Ms. Nelson accepted and transferred a quitclaim deed granting her one of the community's homes under the agreement. When she thereafter disclaimed her concomitant obligations, her attorney informed the appellant of that fact (and appellant promptly disputed the disclaimer) and withdrew from the case because he felt that he could not ethically espouse her position on this matter.

[3] Appellant's arguments about the general scope of attorneys' implied authority are inapposite. The trial court's finding, with which we agree, was that there was *actual* authority to complete the agreement. The nature of the implied authority stemming from an attorney-client relation is therefore not in issue.

Wash. 44, 219 P. 838 (1923). Our present law gives even wider latitude to marital partners to independently dispose of their property by contract, free from court supervision, than was allowed when these cases were decided. *See* RCW 26.09.070(1) and (2). It would be inconsistent with this legislation, and with our prior cases, to tie a contract to the outcome of court proceedings which in no way conditions itself on them.

B.

More seriously, appellant argues that the property settlement agreement was void because one of its provisions obligated decedent to quitclaim an interest in real property to appellant, and it was not signed by her and therefore did not comply with the statute of frauds. Such an agreement touching land is within the statute, and since it appears that the parties "cannot reasonably be considered to have contracted but with a view to the performance of the contract as a whole," noncompliance with the statute as to this aspect of the agreement would seem to void it in its entirety. *Godefroy v. Hupp*, 93 Wash. 371, 377, 160 P. 1056 (1916).

But we cannot say that, under the circumstances of this case, the decedent could have avoided her obligations under this contract through the statute of frauds. Not only did she, as we have found, authorize her attorney to prepare the agreement and consummate it with appellant, she also accepted appellant's partial performance of his contract obligations, implicitly indicating that she would perform hers. Appellant signed the contract and deeded decedent the house in reliance on the mutual understanding that the writing finalized their obligations and was acceptable to and to be honored by both of them. This reliance created a separate agreement that after appellant signed the memorandum evidencing the contract and the deed effecting it, decedent would do the same.

A party who promises, implicitly or explicitly, to make a memorandum of a contract in order to satisfy the statute of frauds, and then breaks that promise, is estopped

to interpose the statute as a defense to the enforcement of the contract by another who relied on it to his detriment. *Alaska Airlines, Inc. v. Stephenson,* 217 F.2d 295 (9th Cir. 1954); *Interstate Co. v. Bry-Block Mercantile Co.,* 30 F.2d 172 (W.D. Tenn. 1928); *Seymour v. Oelrichs,* 156 Cal. 782, 800, 106 P. 88 (1909); *Treadwell v. Henderson,* 58 N.M. 230, 269 P.2d 1108 (1954); *"Moore" Burger, Inc. v. Phillips Petroleum Co.,* 492 S.W.2d 934, 940 (Tex. 1972); 1 Restatement of Contracts § 178 comment *f* at 234 (1932); 3 S. Williston, *A Treatise on the Law of Contracts* § 533A, at 786 (3d ed. W. Jaeger 1960); McNeill, *Agreements to Reduce to Writing Contracts Within the Statute of Frauds,* 15 Va. L. Rev. 553 (1929). "The statute of frauds is designed to prevent, not to promote, fraud." *Becker v. Lagerquist Bros.,* 55 Wn.2d 425, 436, 348 P.2d 423 (1960). It would do nothing less than promote fraud if the law were to allow one person to induce another to sign a memorandum of an agreement and partially perform it by falsely representing that he would do likewise, and then refuse to sign and avoid the obligations he would have incurred if he had. We therefore hold that decedent could not, in a suit on the contract, have prevented appellant from enforcing the property settlement agreement by pleading the statute of frauds. Appellant thus cannot void the agreement as to this litigation by pleading it for her now.

## C.

Appellant's final contention in this area presents a pure question of law: whether a "marriage settlement" which prevents the revocation of an antenuptial will as to an unmentioned spouse under RCW 11.12.050 must be entered into before marriage, or whether the term includes postmarital agreements such as the one between appellant and decedent. No Washington cases have explicitly interpreted this term in this statute. The relevant law from other jurisdictions is apparently limited to a single dictum in a dated California decision, stating that that state's analogous statute was fulfilled only by agreements "in contemplation of marriage." *Corker v. Corker,* 87 Cal. 643, 648, 25 P. 922

(1891). This dearth of authority leaves us free, indeed forced to decide the meaning of this phrase for ourselves.

The language and history of the statute give us no guidance. "Marriage settlement" is defined in Black's Law Dictionary 1125 (4th ed. 1951), without citation of authority, as

> A written agreement in the nature of a conveyance, called a "settlement," which is made *in contemplation of a proposed marriage and in consideration thereof*, either by the parties about to intermarry, or one of them, or by a parent or relation on their behalf, by which the title to certain property is settled, *i.e.*, fixed or limited to a prescribed course of succession; the object being, usually, to provide for the wife and children. . . . *Such settlements may also be made after marriage, in which case they are called "postnuptial."*

(Italics ours.) This definition would make the phrase arguably, but not necessarily, applicable to the Nelsons' agreement. And, as is usually, unfortunately, the case, there is no legislative history to assist us in resolving this ambiguity.

 Appellant attempts to fill this gap in our insight by heavily emphasizing the word "revoked" in the statute. He argues that the antenuptial will is "revoked" by the marriage of the testator; since nothing is said about reviving it once revoked, the implication then is that the marriage settlement agreement must antedate the marriage itself, or the will is irrevocably voided at the instant of marriage. But the statute does not say that the will *is* revoked but that it is *deemed* revoked; the moment referred to by the tense of the predicate is not the moment of marriage but the moment the will is offered to probate. Any marriage settlement made prior to that time could just as well cause it not to be "deemed" revoked.

 The only recourse we have to decide this issue, then, is to focus completely on the purpose of the provision: prevention of the unintentional disinheritance of the spouse of a testator who married after making a will and then died without changing it. That purpose is not served

by deeming a will revoked when *any* separate arrangement exists to indicate that the decedent wished to keep the will in force and provide specially for the spouse. The time at which the agreement is made has no effect on its relevance as an indication of intent. Whether the agreement is ante-nuptial or postnuptial it shows that separate provision was made for the spouse rendering the presumption of intent to revoke inapplicable. We therefore hold that property settlements such as that negotiated between appellant and decedent, which evince a desire on the part of one spouse to grant certain property and no more to the other, are "marriage settlement agreements" within the meaning of that phrase in RCW 11.12.050.

## III

The last question we need decide on this appeal involves the procedure by which the trial court ruled on the admissibility of the will rather than the result it reached. It erred, appellant contends, in preventing him from doing discovery prior to the lost will hearing, depriving him of the ability to intelligently contest the motion to admit the will. The trial court's temporary order prohibiting discovery resulted from the fact that the right to administer decedent's estate was in issue, appellant and respondent Gerald F. Collier both having been appointed administrator. It was directed against each of the contestants and was only issued pending resolution of the dispute over administration, but that dispute was not resolved until the will was admitted to probate naming Jerry Crain Wentworth, decedent's mother, executrix.

We agree with appellant's claims that, in general, parties interested in contesting a motion to admit a lost will to probate should be able to engage in discovery in advance of a hearing thereon. RCW 11.20.070 guarantees interested persons notice in advance of the taking of evidence on the admission of a lost will and the opportunity to themselves submit such evidence. It provides no basis for excepting lost will contests from CR 81(a), which makes the civil

rules, including those authorizing discovery, applicable to "all civil proceedings."

It may be, however, that the unusual circumstances of this case justified the trial court's temporary prohibition of all discovery pending resolution of the dispute over administration. But we need not decide whether they did, for any error there may have been in issuing the restraining order was clearly harmless to appellant and provides no ground for reversal of the judgment against him. Appellant's counsel indicated to the trial court that the only information he wished to discover prior to the lost will contest had to do with the value of the assets in decedent's estate. It is not clear what his reason for desiring such information was, but, as the trial court said, whatever it was it could have no bearing on the outcome of the lost will contest. The findings which must be made before a lost will is admitted to probate are in no way affected by the volume of assets that will distributes. Even if appellant had been allowed to discover the information he sought, it could not have influenced the trial court's decision on the only issue before it: the admissibility of the will to probate. Any error there may have been in denying him discovery was, therefore, harmless.

## IV

Appellant's further contentions need not be considered, as the alternative findings and conclusions they challenge are irrelevant in view of our above disposition of the central issues in the case. Specifically, the trial court's gratuitous declaration that decedent's life insurance—apparently the focus of appellant's interest in this litigation—was her separate property, was not germane to any issue in this case and constitutes no proper part of its judgment. Its disposition of the several complex issues which were before it was, however, correct.

The judgment of the trial court is affirmed.

STAFFORD, C.J., and FINLEY, ROSELLINI, HUNTER, HAMILTON, WRIGHT, BRACHTENBACH, and HOROWITZ, JJ., concur.